No. 101,806

STATE OF KANSAS, *Appellee*, v. SHANNA R. FRIDAY, *Appellant*.

(306 P.3d 265)

1024

1026

Opinion filed August 9, 2013.

*Shawn E. Minihan*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Charles E. Branson*, district attorney, argued the cause, and *Nicole Romine*, assistant district attorney, and *Steve Six*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

NUSS, C.J.: We granted Shanna Friday's petition for review of the Court of Appeals decision affirming her conviction and sentence for second-degree unintentional murder stemming from the beating of Jerry Deshazer. The issues on appeal, and our accompanying holdings, are as follows:

1. Did the prosecutor commit misconduct during her argument? Yes, but harmless error.
2. Did the district court err in refusing to instruct the jury on self-defense? No.
3. Did the district court err in instructing the jury on aiding and abetting? No.
4. Did the district court err in excluding specific evidence of a witness' plea bargain? No.
5. Did cumulative error deny Friday a fair trial? No.
6. Does the identical offense sentencing doctrine require reversing and remanding for resentencing? No.
7. Did the district court err in including Friday's prior convictions in her criminal history score without their being proved to a jury beyond a reasonable doubt? No.

We therefore affirm the district court and the Court of Appeals panel.

## FACTS

On February 2, 2008, Deshazer was found dead in a bathtub in

his mobile home in Lawrence. His body was covered in blood, and according to the coroner, his face was "just bashed in." The coroner determined the cause of death was blunt force injuries to the head, with additional contributing medical conditions.

The night before Deshazer's death, he got together at his home with Jerod Buffalohead, Jarvis Jones, and defendant Friday. Buffalohead and Jones arrived around 4:30 p.m., and Friday arrived around 5 p.m. All four drank alcohol together throughout the evening. Shortly after arriving, Buffalohead left and returned around 8:45 p.m.

At one point, Friday got into a verbal altercation with Deshazer. Their argument never became physical, and they eventually cooled down.

Shortly after Buffalohead returned to Deshazer's home, a physical altercation began. Buffalohead, Friday, and Jones each offered different versions of the episode that resulted in Deshazer's death.

### Jerod Buffalohead

According to Buffalohead's testimony for the defense, he heard arguing when he returned to the mobile home around 8:45 p.m. Somebody told Buffalohead that he owed Deshazer money, so Buffalohead offered to pay Deshazer. But Deshazer said Buffalohead did not owe him anything. While Buffalohead was getting ice, "a fight started" between Friday and Deshazer. Buffalohead testified:

"I'm not real sure how the fight started, but I heard a slap, I heard a thud on the ground and—

. . . .

" . . . [w]hen I heard all that, I turned around and Jerry [Deshazer is] on, is on, not on top of her—I don't know if they fell, I don't know—

. . . .

" . . . I don't know if they tripped, but I pulled [Deshazer] off of [Friday]."

After Buffalohead pulled Deshazer from Friday, he sat Deshazer in a chair and Friday momentarily left the room. When she returned, she again argued with Deshazer. According to Buffalohead, "Jerry had a small bottle and I think that was plastic, but he threw it and it was, it landed in between 'em or he threw it on the ground."

After Deshazer threw the bottle, Friday slapped him and they started fist fighting. Buffalohead then separated them. Jones also intervened and began hitting Deshazer. Buffalohead cussed at Jones for hitting Deshazer. Friday then hit Deshazer in the face with a bottle. According to Buffalohead, he tried to grab the bottle, but it shattered on Deshazer's head.

Jones continued to punch Deshazer's face until Buffalohead pulled him away. When Deshazer then stood up from his chair and started to go after Jones, Buffalohead threw a blanket over Deshazer to calm him down. Deshazer tripped over the blanket; then Buffalohead and Jones picked him up and put him back in his chair. After Buffalohead asked Friday if she had called for help, he left to go to his parents' house.

*Shanna Friday*

According to Friday's statements to police, at some point in the evening Buffalohead became angry at how Deshazer was treating Friday. So Buffalohead and Jones began beating Deshazer while he was sitting in a chair. They eventually threw a blanket over his head. Friday then punched Deshazer three times in the face, with Buffalohead and Jones moving out of her way. During the beating, Deshazer "fought with his mouth" by "talking shit." According to Friday, Jones hit Deshazer with an ashtray, but she repeatedly denied anybody hit Deshazer with a bottle.

After the physical altercation ended, Friday gave Deshazer water, some pills, and a blanket. She also tried to wipe him off. When she offered to call the police or an ambulance, he declined. Friday then lay on the couch and fell asleep. She awoke in the middle of the night and noticed Deshazer stumbling from one end of the home to the other. She also saw excrement. Friday apparently went back to sleep and left around 8 a.m. Before she left, Friday asked Deshazer if he was doing OK and if he wanted her to call the police or an ambulance. Deshazer responded from the bathroom that he was OK and did not want Friday to call anyone for help.

### Jarvis Jones

According to Jones' testimony for the State, before Buffalohead returned to the home Deshazer said that Buffalohead owed him money. Friday then encouraged Deshazer to tell Buffalohead this when he came back. Buffalohead then walked in and asked, "Tell me what?" So Friday told Buffalohead that Deshazer thought Buffalohead owed him money. Buffalohead then stood over Deshazer, and Deshazer "let the matter go."

Jones had little recollection of the remaining events because he testified he was drunk and had blacked out from the alcohol. The next thing Jones remembered was people yelling. He saw Buffalohead hit Deshazer five or six times while Deshazer was seated in a chair. While Buffalohead was the only person Jones saw hit Deshazer, Friday was egging Buffalohead on by saying, "That's what you get, that's what you get." Buffalohead then threw a blanket or rug over Deshazer's head.

Jones soon passed out again. When he awoke at 2:30 a.m., Jones saw Deshazer moaning in his chair with his head back. Deshazer's face and chest area were bloody. Jones then saw Deshazer "slump" out of his chair and crawl to his bedroom. Jones left, intending to return to his own home, but he ended up drinking with Deshazer's neighbor. At dawn, Jones left the neighbor's home and returned to Deshazer's where he fell asleep in a back bedroom.

### Finding the body and the police investigation

Later that morning Jim Vincent arrived at Deshazer's home. Vincent could not find Deshazer and left. He returned an hour later and asked Nancy Kelch to look for Deshazer. Kelch found him dead in his bathroom.

When police arrived, they found broken glass—including the neck of a whiskey bottle covered in blood and a broken ashtray—in Deshazer's home. DNA on the broken ashtray and on the neck of the broken bottle matched Deshazer, while DNA on the bottle mouth matched Buffalohead. The police also found several items covered in blood, including a comforter and pillow. They further noticed a vast amount of blood, including significant amounts on Deshazer's recliner, on his floor, and in his bathroom.

The next day police found bloody clothes in a trash can outside of Friday's residence. Friday admitted the clothes belonged to her, including a jacket, a pair of shoes, athletic pants, a T-shirt, a pair of socks, and women's underwear. DNA on the bloody jacket matched Deshazer. Friday agreed to accompany police to their station where she was read her *Miranda* rights and questioned.

The State eventually charged Friday with one count of unintentional reckless second-degree murder in violation of K.S.A. 21-3402(b). At trial, in addition to presenting Jones' testimony, the State played a video recording of Friday's interview with the police.

The jury convicted Friday of the charge. This offense is a severity level 2 person felony, and the district court sentenced her to 174 months' incarceration. The Court of Appeals affirmed in *State v. Friday*, No. 101,806, 2010 WL 3211703 (Kan. App. 2010) (unpublished opinion), and we granted Friday's petition for review under K.S.A. 20-3018.

Additional facts will be provided as necessary to the analysis.

## ANALYSIS

Issue 1: *The prosecutor did not commit reversible error.*

Friday argues the prosecutor committed misconduct in her closing argument and the error is reversible. The State concedes the conduct was questionable but argues the error was harmless.

### Standard of review

We have said that review of prosecutorial misconduct claims involves a two-step process. The court first decides whether the comments were outside the wide latitude a prosecutor is allowed, e.g., in discussing the evidence. If so, there was misconduct. Second, if misconduct is found, we have said that the court must determine whether the improper comments prejudiced the jury and denied the defendant a fair trial. *State v. Marshall*, 294 Kan. 850, 856, 281 P.3d 1112 (2012).

For years we have considered several factors in analyzing this second step: (1) whether the misconduct was gross and flagrant; (2) whether it was motivated by prosecutorial ill will; and (3) whether the evidence was of such a direct and overwhelming na-

ture that the misconduct would likely have had little weight in the minds of jurors. None of these three factors has been individually controlling. *Marshall*, 294 Kan. at 857.

Since 2004, this court has also demanded that any prosecutorial misconduct error meet the "dual standard" of both constitutional harmlessness and statutory harmlessness to uphold a conviction. See *State v. Tosh*, 278 Kan. 83, 97, 91 P.3d 1204 (2004) (Before the third factor can ever override the first two factors, an appellate court must be able to say that the harmlessness tests of both K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), have been met.).

Under the constitutional harmless error analysis defined in *Chapman*,

"the error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict." *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

Under the harmless error analysis defined in K.S.A. 60-261, the test is equally clear. The court "determine[s] if there is a reasonable probability that the error did or will affect the outcome of the trial in light of the entire record." 292 Kan. 541, Syl. ¶ 6.

Under both standards, the party benefiting from the error— here, allegedly the State—bears the burden of demonstrating harmlessness. *State v. Herbel*, 296 Kan. 1101, 1110, 299 P.3d 292 (2013). That burden is higher when the error is of constitutional magnitude. See *Herbel*, 296 Kan. at 1110 ("Clearly, the party benefiting from the constitutional error must meet a higher standard to show harmlessness than the standard required in nonconstitutional error.").

*Discussion*

The prosecutor's statement in rebuttal closing argument about which Friday complains asked the jury to give Deshazer his dignity back.

"Murder takes away a lot of things. The obvious, it takes a life. It takes a father from his children, it takes a brother from a brother. It takes a grandfather from grandchildren, but it takes a whole lot more, and in this case *it took away Jerry Deshazer's dignity*. He has been called in this courtroom any number of things, without the ability to defend himself. He has been called a mean drunk; he has been called an old man; he has been called an obnoxious mouthy alcoholic.

"And then if it's not, if wasn't bad enough, *you have the total loss of dignity in the way he was found*. A house that he obviously keeps very neat, covered with his own blood, with his own fecal matter. All of the neat things that he had knocked over as he stumbled bleeding through that house, and then ultimately having to have you, on this big screen in this courtroom, a picture of him in the bathroom with his pants pulled down and almost exposing his genitals. Blood all over his face, his face swollen. You wouldn't even know what he looked like before this. Because that wasn't Jerry Deshazer in that tub, not the one that everyone knew. *And what can happen here in this courtroom? A verdict of guilty can return to that man the dignity he lost on February 1st*." (Emphasis added.)

Friday contends the argument diverted the jury from its duty to decide the case based on the evidence and the controlling law, attacked her exercise of her right to trial, and was meant only to inflame the passions of the jury. The State responds the comment rebutted defense counsel's statements during closing argument but orally conceded to us that the comments were "questionable."

Under the first step of our analysis we decide whether the comments were outside the wide latitude a prosecutor is allowed, *e.g.*, in discussing the evidence. And we do not allow a prosecutor to comment on irrelevant facts regarding the impact of a crime on the victim or the victim's family. *State v. Stano*, 284 Kan. 126, 150, 159 P.3d 931 (2007). Here, the prosecutor used evidence, including the irrelevant fact that Deshazer kept his home neat and clean, and tied it directly to the impact of the crime on Deshazer. Additionally, the prosecutor asked the jury to return Deshazer's dignity with a guilty verdict.

This conduct diverted the jury from its " 'duty to decide the case based on the evidence and the controlling law.' " *State v. Raskie*, 293 Kan. 906, 917, 269 P.3d 1268 (quoting *Tosh*, 278 Kan. at 90). As the Court of Appeals panel accurately stated: "[T]he relevant impact on Deshazer under the applicable law was the loss of his life, not the loss of his dignity." *Friday*, 2010 WL 3211703, at *5. We find prosecutorial misconduct.

We acknowledge, as did the panel, that some of the comments were probably in response to defense counsel's closing arguments that Deshazer was "a very mean drunk" and "a mean drunk" who "kept" and "enjoyed" the company of "crack addicts." *Friday*, 2010 WL 3211703, at *4. But as we clarified in *Marshall*, a facially improper comment by a prosecutor responding to defense counsel's argument is but one factor to consider in the overall calculus; it no longer absolutely rinses off possible misconduct. 294 Kan. at 860 ("The open-the-door rule does not insulate a prosecutor from a finding of misconduct.").

With the prosecutorial misconduct established, we turn to the second analytical step. See *Marshall*, 294 Kan. at 857. This includes determining whether the prosecutor's improper comments were harmless error under the standards of both K.S.A. 60-261 and *Chapman*, 386 U.S. 18.

We recently held that when the constitutional and nonconstitutional error clearly arises from the very same acts and omissions, we logically begin with our harmlessness analysis of the constitutional error. See *Herbel*, 296 Kan. at 1111. We reach this conclusion because if we decide the constitutional error is not harmless and reverse the convictions, there is no point in analyzing whether the State met the lower standard for harmlessness under K.S.A. 60-261. *Herbel*, 296 Kan. at 1111.

In turning to our constitutional error analysis, we review the factors upon which Friday relies to argue reversal and remand to the district court. Per *Tosh*, these are gross and flagrant conduct and prosecutorial ill will. See 278 Kan. at 93.

In determining whether prosecutorial misconduct was gross and flagrant, among the things we have considered are whether the comments were repeated, emphasized improper points, were planned or calculated, or violated well-established or unequivocal rules. See, *e.g.*, *State v. Brown*, 295 Kan. 181, 214, 284 P.3d 977 (2012). In determining whether prosecutorial misconduct was motivated by ill will, among the things we have considered are whether the conduct was deliberate or in apparent indifference to a court's ruling. See, *e.g.*, *Marshall*, 294 Kan. at 862; see also Gershman, Prosecutorial Misconduct § 14.5, pp. 602-03 (2d ed. 2012)

("'Other factors considered by courts in determining harmfulness are whether the prosecutor's misconduct was deliberate, related to a crucial issue in the trial, or was followed by a prosecutorial apology.'"); *cf.* Prosecutorial Misconduct § 10:51, p. 458 (a prosecutor's failure to obey court rulings increases the likelihood of reversal). As with determining gross and flagrant conduct, for determining ill will this court has also considered whether the conduct was repeated. *Marshall*, 294 Kan. at 862.

Based on these standards, we agree with the Court of Appeals panel that the prosecutor's comments were not gross or flagrant nor motivated by ill will. The comments constituted 1 page of about 30 total pages of closing argument by the State. We also recognize the prosecutor was, at least in part, attempting to rehabilitate Deshazer's reputation after defense counsel attacked it in closing argument. See *Marshall*, 294 Kan. at 860-61.

In continuing our constitutional harmlessness analysis, we address the State's argument that there is no reasonable possibility the misconduct contributed to the verdict. See *Ward*, 292 Kan. 541, Syl. ¶ 6. More specifically, as the panel recognized, the evidence supporting Friday's conviction is also strong. "Under every version of events, including defendant's, she was involved in the altercation that led to Deshazer's death, either assaulting Deshazer or encouraging others as they did so." *Friday*, 2010 WL 3211703, at *5. So considering the overall standard of review for determining the magnitude of constitutional error as stated earlier, we conclude the prosecutorial misconduct was harmless error. *Ward*, 292 Kan. 541, Syl. ¶ 6. Given this holding, we need not determine whether the State has met its burden of showing harmless error under the lower standard articulated in K.S.A. 60-261. See *Herbel*, 296 Kan. at 1111.

Issue 2: *The district court correctly refused to instruct the jury on self-defense.*

Friday argues that the district court should have granted her request to instruct the jury on self-defense. Primarily through Buffalohead's testimony, she contends she presented sufficient evidence to warrant such an instruction. The State essentially re-

sponds that Buffalohead's testimony did not support self-defense because it showed Friday, not Deshazer, as the one who actually initiated the attack that resulted in Deshazer's death.

The trial judge held there was insufficient evidence: "I don't think we can argue that anybody believed she was in imminent danger." And the Court of Appeals panel essentially agreed, concluding Friday was at least a coaggressor in mutual combat and that the evidence failed to demonstrate she had a subjective belief her use of such deadly force was necessary to defend herself from an imminent use of force by Deshazer. We agree no self-defense instruction was warranted.

*Standard of review*

In analyzing a preserved jury instruction issue on appeal, we implement a stair-step process. As we recently explained in *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012):

"For jury instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012)."

There is no dispute the self-defense instruction issue was appropriately raised and preserved for appellate review. We jointly consider whether the instruction was legally appropriate and, if so, whether the evidence would support giving it.

*Discussion*

Generally, a defendant is entitled to instructions on the law applicable to his or her defense theory if there is sufficient evidence for a rational factfinder to find for the defendant on that theory. *State v. McCullough*, 293 Kan. 970, 974, 270 P.3d 1142 (2012) (self-defense). And if that defendant requests an instruction at trial,

the court must view the evidence in the light most favorable to the defendant. *State v. Anderson*, 287 Kan. 325, 334, 197 P.3d 409 (2008).

Continuing with *Plummer* steps two and three, particularly determining whether the instruction was legally appropriate, we acknowledge that the elements to establish the right to use deadly force in self-defense are codified at K.S.A. 21-3211. That statute states:

"(a) A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such force is necessary to defend such person or a third person against such other's imminent use of unlawful force.

"(b) A person is justified in the use of deadly force under circumstances described in subsection (a) if such person reasonably believes deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person."

We have recognized that K.S.A. 21-3211 sets out a two-part test.

"The first is *subjective* and requires a showing that [Friday] sincerely and honestly believed it was necessary to kill to defend herself or others. The second prong is an *objective* standard and requires a showing that a reasonable person in [Friday's] circumstances would have perceived the use of deadly force in self-defense as necessary. [Citation omitted.] " (Emphasis added.) *McCullough*, 293 Kan. at 975.

For Friday's contention that Buffalohead's testimony supports giving the instruction, she points out he stated:

"I'm not real sure how the fight started, but I heard a slap, I heard a thud on the ground and—

    . . . .

". . . [w]hen I heard all that, I turned around and [Deshazer is] on, is on, not on top of her—I don't know if they fell, I don't know—

    . . . .

" . . . I don't know if they tripped, *but I pulled [Deshazer] off of [Friday]*." (Emphasis added.)

Buffalohead further testified that after they sat Deshazer in a chair, Friday left the room. After this break in the action, Friday reentered the room and began to argue with Deshazer again. Buffalohead testified Deshazer had a small bottle that he threw and it landed in between them "or he threw it on the ground." Friday

soon slapped Deshazer, and a fist fight ensued. Buffalohead then got between them again, causing yet another break in the action. But as the State points out, per Buffalohead's testimony, Friday resumed the fight by breaking a bottle over Deshazer's head.

We agree with the Court of Appeals panel that Friday was at least a coaggressor in mutual combat. As we have explained:

"The doctrine of self-defense cannot excuse a killing done when the defendant *willingly engaged in mutual combat* unless the defendant has withdrawn in good faith and done everything in the defendant's power to avert the necessity of the killing. [*State v. Barnes*, 263 Kan. 249, 266, 948 P.2d 627 (1997)]. This rule does not destroy the right to self-defense in all mutual combat cases; but for self-defense to justify the killing, the defendant must be acting 'solely for the protection of [the defendant's] own life, and not to inflict harm upon [the defendant's] adversary.' *State v. Burgess*, 245 Kan. 481, 487, 781 P.2d 694 (1989) (quoting 40 Am. Jur. 2d, Homicide § 142)." (Emphasis added.) *McCullough*, 293 Kan. at 975-76.

This court has defined mutual combat as " '[o]ne into which both the parties enter willingly or voluntarily; it implies a common intent to fight, but not necessarily an exchange of blows.' " *State v. Coop*, 223 Kan. 302, 306, 573 P.2d 1017 (1978) (quoting Black's Law Dictionary 332-33 [Rev. 4th ed. 1968]). And we have held that it does not matter who initiated the confrontation when both parties willingly engaged in it:

"If the parties fought by mutual consent the circumstances of who committed the first act of violence was immaterial; and, so long as each combatant persisted in his original determination to vanquish his antagonist the aggressions were mutual. A resistance which has for its real object the securing of an opportunity to mangle the assailant is not legal self-defense." *McNeil v. Mullin*, 70 Kan. 634, 637, 79 P. 168 (1905).

When the evidence is viewed in the light most favorable to Friday, not only does it clearly reveal that she and Deshazer engaged in mutual combat but also that she failed to withdraw in good faith and do everything in her power to avoid killing Deshazer. *McCullough*, 293 Kan. at 976. Simply put, Friday stayed in the house during breaks in the action and then resumed her participation.

We further agree with the district court's refusal to instruct, and the panel's affirmation of that refusal, because of a lack of imminent danger to Friday. As the panel pointed out, she never ex-

pressed a need to defend herself against Deshazer. And when Buffalohead and Jones were beating Deshazer in the final confrontation, they deliberately stepped back so that Friday could punch him in the face three times. Friday later told the police Deshazer was not fighting back at that time—he was only "talking shit." We easily conclude there is no evidence showing that Friday had a sincere and honest subjective belief that her use of such force was necessary to defend herself from imminent death or great bodily harm by Deshazer, and there is no evidence showing a reasonable person in her position would have believed so either. See *McCullough*, 293 Kan. at 975.

Accordingly, the district court correctly denied Friday's request for the self-defense instruction as being factually inappropriate on this record.

Issue 3: *The district court correctly instructed the jury on aiding and abetting.*

At trial, Friday objected to the aiding and abetting instruction because she alleged insufficient evidence justified giving it. The trial court overruled her objection. Friday now changes her argument to contend the instruction was erroneously given because it is a logical impossibility to aid a person with the intent to further an unintentional crime. The State briefly responds that *State v. Garza*, 259 Kan. 826, 916 P.2d 9 (1996), controls, and its holding was correctly applied by the Court of Appeals to affirm the district court ruling on this alternative basis. We agree the instruction was warranted.

*Standard of review*

We start by acknowledging that "[w]here a trial objection to a jury instruction is different from the argument presented on appeal, a clearly erroneous standard of review applies." *State v. Ellmaker*, 289 Kan. 1132, Syl. ¶ 1, 221 P.3d 1105 (2009); see K.S.A. 22-3414(3) (A party must object before the jury retires to consider its verdict, "stating distinctly the matter to which the party objects and the grounds of the objection unless the instruction or the failure to give an instruction is clearly erroneous.").

We refined our "clearly erroneous" standard of review framework in *State v. Williams*, 295 Kan. 506, Syl. ¶¶ 4-5, 286 P.3d 195 (2012):

"To determine whether an instruction or a failure to give an instruction was clearly erroneous, the reviewing court must first determine whether there was any error at all. To make that determination, the appellate court must consider whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record."

"If the reviewing court determines that the district court erred in giving or failing to give a challenged instruction, then the clearly erroneous analysis moves to a reversibility inquiry, wherein the court assesses whether it is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. The party claiming a clearly erroneous instruction maintains the burden to establish the degree of prejudice necessary for reversal."

*Discussion*

The aiding and abetting statute in effect at the time of Deshazer's beating, K.S.A. 21-3205(1), provided that "[a] person is criminally responsible for a crime committed by another if such person intentionally aids, abets, advises, hires, counsels or procures the other to commit the crime." Friday particularly contends that aiding and abetting is a specific intent crime; it cannot be applied to reckless second-degree murder because it is logically impossible to aid and abet a reckless act. *Cf. State v. Engelhardt*, 280 Kan. 113, 132, 119 P.3d 1148 (2005) ("[A] person guilty of aiding and abetting a premeditated first-degree murder must be found, beyond a reasonable doubt, to have had the requisite premeditation to murder the victim."). So Friday basically argues the instruction was legally inappropriate. See *Williams*, 295 Kan. 506, Syl. ¶ 6.

Friday admits—as the State argues—that in *Garza*, 259 Kan. 834-35, we specifically held that a person could be held liable for aiding and abetting a reckless crime. In *Garza*, "bad blood" existed between Garza and a man named Vaca. After meeting outside a store, the two men obtained guns and started shooting at each other. Jennifer Minton stood behind Garza and was struck by one of Vaca's bullets. Although it was a Vaca bullet that hit Minton, Garza was later charged with the aggravated battery of Minton.

After finding Garza had not fired the shot that hit Minton, the district court dismissed the complaint.

We reversed. After reviewing caselaw from other jurisdictions, we recognized that " 'two persons act in concert when "one . . . engages in conduct" and the other intentionally aids him [or her] in that conduct.' " *Garza*, 259 Kan. at 832. We acknowledged that "the law also provides that individuals may act together in the commission of a crime based upon their depraved, indifferent, or reckless conduct." 259 Kan. at 834. We ultimately held that "[g]iving assistance or encouragement to one who it is known will thereby engage in conduct dangerous to life is sufficient for accomplice liability as an aider or abettor as to crimes defined in terms of recklessness or negligence." 259 Kan. 826, Syl. ¶ 6. The *Garza* court noted that while the two shooters had cross-purposes in shooting at each other, they were both acting in concert as to bystanders because the probable consequences were reasonably foreseeable. So the *Garza* court held that the district court incorrectly dismissed the complaint.

Per *Garza*, Friday unquestionably aided and abetted Deshazer's fellow attackers. She admitted punching Deshazer in the face several times. Buffalohead testified that Friday hit Deshazer over the head with a bottle, while Jones testified that Friday was encouraging Buffalohead to strike Deshazer. We agree with the Court of Appeals panel that Friday participated in the beating of Deshazer or at least encouraged Buffalohead and Jones in their beating of him, ultimately leading to his death. *Friday*, 2010 WL 3211703, at *8. In short, we conclude Friday was giving assistance or encouragement to others who were engaging "in conduct dangerous to life . . . as to crimes defined in terms of recklessness or negligence." See *Garza*, 259 Kan. at 835.

But Friday asks this court to reject *Garza* as wrongly decided and to instead adopt the reasoning in *State v. Shannon*, 258 Kan. 425, 905 P.2d 649 (1995). There, the defendant was convicted of first-degree murder and aggravated assault. The *Shannon* court held that he was not entitled to instructions on the lesser included offenses of attempted second-degree murder, attempted voluntary manslaughter, and attempted involuntary manslaughter. The court

determined that the attempt statute requires a person to possess the specific intent to commit a crime. So it concluded that because second-degree murder under K.S.A. 21-3402(b) requires an unintentional killing, it would be a logical impossibility for a person to specifically intend to commit an unintentional crime. 258 Kan. at 428-29.

Friday argues that the *Shannon* rationale—a person cannot specifically intend to commit an unintentional crime—should apply to her situation because, like attempt, aiding and abetting is a specific intent crime. See *State v. Becker*, 290 Kan. 842, 852, 235 P.3d 424 (2010). We disagree with her reasoning.

At the time of Friday's offense, the aiding and abetting statute provided that a person "is criminally responsible for a crime committed by another if such person intentionally aids, abets, advises, hires, counsels or procures the other to commit the crime." K.S.A. 21-3205(1). Under this statute, obviously the aider or abettor must intentionally assist the principal. And it is true we have recognized that for an aider to assist a principal in carrying out a specific intent crime, the aider must possess the "same specific intent to commit the crime as the principal." See *Becker*, 290 Kan. at 852 (citing *State v. Overstreet*, 288 Kan. 1, 13, 200 P.3d 427 [2009]). But the underlying crime in this case—reckless second-degree murder—simply is not a specific intent offense.

We therefore conclude the aiding and abetting jury instruction was both factually and legally appropriate, and the district court did not err in giving it. See *Williams*, 295 Kan. 506, Syl. ¶¶ 4-5.

Issue 4: *The district court did not err when it excluded specifics of Buffalohead's plea bargain.*

Friday argues that the district court erroneously excluded certain information about Buffalohead's plea bargain. Friday was allowed to ask Buffalohead whether he had entered a plea as a result of the attack on Deshazer but was prevented from asking any specifics about the charge to which he pled. She contends this improperly limited her ability to thoroughly cross-examine a witness and also violated her right of confrontation.

The State counters that the district court did not abuse its discretion in excluding the evidence. It also argues there is no Confrontation Clause issue because Buffalohead was Friday's own witness, not the State's. The Court of Appeals agreed with the State. We agree the evidence was properly excluded.

*Standard of review*

We begin by recognizing that when reviewing a district court decision to admit or exclude evidence, we use a multistep analysis. *State v. Shadden,* 290 Kan. 803, 817, 235 P.3d 436 (2010). For the first step, we determine whether the evidence is relevant. Evidence is relevant when it has "any tendency in reason to prove any material fact." K.S.A. 60-401(b). Accordingly, relevant evidence must be both probative and material. *State v. Martinez,* 290 Kan. 992, 1009, 236 P.3d 481 (2010) (citing *State v. Dixon,* 289 Kan. 46, 69, 209 P.3d 675 [2009]).

Whether evidence is probative is reviewed under an abuse of discretion standard; materiality is judged under a de novo standard. *Shadden,* 290 Kan. at 817 (citing *State v. Reid,* 286 Kan. 494, 507-09, 186 P.3d 713 [2008]).

For the second step, we determine which rules of evidence or other legal principles apply. The district court's conclusion is reviewed de novo. *Shadden,* 290 Kan. at 817. For the third step, the district court must apply the applicable rule or principle. This application is reviewed either for abuse of discretion or de novo, depending on the rule or principle being applied. Some rules and principles grant the district court discretion, while others raise matters of law. 290 Kan. at 817.

Here, we are asked to review the exclusion of certain details of Buffalohead's plea bargain, which is generally reviewed for abuse of discretion. See *State v. Sharp,* 289 Kan. 72, 97, 210 P.3d 590 (2009) (it lies within the sound discretion of the trial court to determine the propriety and scope of the defense's examination of an accomplice). Whether the evidence's probative value outweighs the potential for undue prejudice is also generally reviewed for abuse of discretion. *Reid,* 286 Kan. at 512 (citing *State v. Garcia,*

285 Kan. 1, 18, 169 P.3d 1069 [2007]). The party who asserts abuse of discretion bears the burden of showing it. *Reid*, 286 Kan. at 512.

To the extent the district court's evidentiary exclusion infringed upon a defendant's constitutional right to confront witnesses—as Friday alleges—we exercise de novo review. See *State v. White*, 279 Kan. 326, 332, 109 P.3d 1199 (2005) ("[W]hile we have said that the admissibility of evidence is often within the discretion of the district judge, constitutional considerations still prevail. [Citation omitted.]").

*Discussion*

Before opening statements, the State moved to prevent the defense from discussing the specifics of Buffalohead's plea bargain. The prosecutor stated:

"The defense is planning on calling Jerod Buffalohead, the codefendant, who the Court is well aware has [pled] and been sentenced. Our objection would be getting into the fact that he—I don't know if he wants to get into that he [pled], but I don't think getting into what he [pled] to is proper. *It's going to be prejudicial because it shows a different charge than what [Friday is] charged with. We can't get into the fact that she was made the same plea offer, and actually was even made a better plea offer than Jerod Buffalohead was made, and we can't do that, so I don't think it's fair to get into what it is that he [pled] to. It's prejudicial to the State.* That's basically our request." (Emphasis added.)

The district court noted that Buffalohead was being called by the defense and not the State. So it concluded that any information about the charge to which Buffalohead pled was not relevant or, if so, its relevance was outweighed by the prejudice to the State. The court elaborated on this limitation by telling Friday, "[Y]ou can ask him if he pled to a crime as a result of this offense," but prohibited the defense from discussing the elements. When the defense asked Buffalohead on direct examination if he had pled "as a result of this case," Buffalohead responded affirmatively.

At the outset, like the Court of Appeals panel we reject Friday's request for de novo review. Friday called Buffalohead as her witness and does not explain how his testifying on her behalf implicated her right to confrontation and entitled her to de novo review. For as we have held: "The primary purpose of the Confrontation Clause is to give the *accused the opportunity* for cross-examination

*to attack the credibility of the State's witnesses."* (Emphasis added.) *State v. Humphrey,* 252 Kan. 6, 21, 845 P.2d 592 (1992).

And like the panel, when applying the abuse of discretion standard to the district court's evidentiary ruling, we hold there was no abuse. Generally, when the State calls an accomplice as a witness, the defendant is allowed to cross-examine about the plea agreement to help the jury understand the witness' potential motivations for testifying. But we allow the district court to limit the inquiries. See *Sharp,* 289 Kan. at 97-100 (citing cases).

Because Buffalohead was not the State's witness, but Friday's, any defense concern that the jury receive adequate information about his potential motivations for testifying is greatly diluted, if not eliminated. Friday simply does not explain how the specifics of Buffalohead's pleading "as a result of this case" are probative of his credibility as her own witness. See *State v. Richmond,* 289 Kan. 419, 437, 212 P.3d 165 (2009) (probative evidence requires a logical connection between the asserted facts and the inferences they are intended to establish).

We hold Friday has not met her burden of showing the district court abused its discretion in disallowing her inquiry into the details of Buffalohead's plea bargain.

Issue 5: *The cumulative error doctrine does not apply to a single trial error.*

Friday argues that even if no single error at trial is sufficient to require reversal and remand, the cumulative effect of errors nevertheless deprived her of a fair trial. But the only error was in the prosecutor's closing argument, which we determined was harmless. We agree with the State and the Court of Appeals panel that without more error to accumulate, the error remains harmless. See *State v. Houston,* 289 Kan. 252, 277, 213 P.3d 728 (2009) (The presence of one trial error is insufficient to accumulate.).

Issue 6: *The identical offense sentencing doctrine does not apply because involuntary manslaughter is a lesser included offense of reckless second-degree murder.*

Friday next argues that instead of being sentenced for reckless second-degree murder under K.S.A. 21-3402(b), a severity level 2 person felony, she should have been sentenced for involuntary manslaughter under K.S.A. 21-3404(b), a severity level 5 person felony. More specifically, she argues that the two offenses contain identical elements and per the identical offense sentencing doctrine she must be resentenced for the lesser offense. Under this doctrine, if two criminal offenses have identical elements but different penalty classifications, a defendant convicted of either crime may be sentenced only under the lesser penalty provision. *State v. Thompson*, 287 Kan. 238, 258-59, 200 P.3d 22 (2009). The State responds that the doctrine is inapplicable to Friday. See *State v. Sandberg*, 290 Kan. 980, 235 P.3d 476 (2010).

*Standard of review*

Whether Kansas' identical offense sentencing doctrine applies is a question of law to which we apply de novo review. *Sandberg*, 290 Kan. at 984.

*Discussion*

After the Court of Appeals panel released its decision in *Friday*, we rejected this identical argument in *State v. Bridges*, 297 Kan. 989, Syl. ¶ 27, 306 P.3d 244 (2013). There, we reinforced our prior holding that the identical offense doctrine does not apply to mere severity levels of the same offense. *Bridges*, 297 Kan. at 1019. (citing *Sandberg*, 290 Kan. at 988). And involuntary manslaughter is simply one of four degrees of homicide. See *State v. Cheever*, 295 Kan. 229, 258, 284 P.3d 1007 (2012) ("[O]ur caselaw has recognized the following homicide degree crimes, in descending order: first-degree murder, second-degree murder, voluntary manslaughter, and involuntary manslaughter."). As we observed in *Bridges*:

" 'Thus, in [*State v.*] *Gregory*[, 218 Kan. 180, 182-83, 542 P.2d 1051 (1975)], we held that *involuntary manslaughter is a lesser degree of second-degree murder and is therefore a lesser included crime under K.S.A. 21-3107(2)(a)*. We explained that while it appears murder and manslaughter are different crimes, " 'they involve but one crime and are only degrees of felonious homicide.' " 218 Kan. at 183 (quoting Warren on Homicide § 83, pp. 415-16).' " *Bridges*, 297 Kan. at 1021 (quoting *Cheever*, 295 Kan. at 258).

Based upon *Cheever* and its citation to *Gregory*, we concluded in *Bridges*, 297 Kan. 1021, that involuntary manslaughter as set out in subsection (b) of K.S.A. 21-3404 is likewise a lesser offense of unintentional second-degree murder as set out in subsection (b) of K.S.A. 21-3402. See K.S.A. 21-3107(2)(a) ("A lesser included crime is [a] lesser degree of the same crime."). So the identical offense doctrine does not apply to Friday's situation. In short, the district court correctly sentenced Friday for the severity level 2 person felony and not the lesser included severity level 5 person felony.

**Issue 7:** *Friday's prior convictions may be included in her criminal history score without requiring a jury to prove their validity.*

For Friday's last argument, she contends the district court violated her rights under the Sixth and Fourteenth Amendments to the United States Constitution by relying on her criminal history score to increase her sentence. Specifically, she contends that before her prior convictions could be used, they were required to be reproven to a jury beyond a reasonable doubt. Friday acknowledges we have previously rejected this position, and she presents it strictly to preserve her federal review. See, *e.g.*, *State v. Baker*, 287 Kan. 345, 371, 197 P.3d 421 (2008); *State v. Ivory*, 273 Kan. 44, 46-47, 41 P.3d 781 (2002). We continue to reject this argument.

Affirmed.