No. 102,877

STATE OF KANSAS, *Appellee*, v. BERNARD CLINE, *Appellant*.
(283 P.3d 194)

Opinion filed August 17, 2012.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, argued the cause, and *Theresa L. Barr*, of the same office, was on the brief for appellant.

*Sheryl L. Lidtke*, deputy district attorney, argued the cause, and *Robbin L. Wasson*, senior assistant district attorney, *Jerome Gorman*, district attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Bernard Cline was convicted of premeditated first-degree murder after a jury trial. The trial court imposed a life sentence, without the possibility of parole for 25 years. He appeals two evidentiary issues.

## FACTUAL BACKGROUND

After work on Friday, September 21, 2007, Richard Carter went to Bernard Cline's home to help erect a tent for Cline's birthday celebration, which was scheduled for the following day. After setting up the tent, Carter went up to Cline's apartment. While Carter was drinking a beer on the balcony outside Cline's apartment with Cline's girlfriend, Vernadine Releford, Cline was playing with a remote control car in the street visible from the balcony.

Cline walked up the stairs to Carter, and they talked about the remote control car. Cline abruptly told Carter, "I'm going to kill that mother fucker." When Carter asked for clarification, Cline pointed to his neighbor, Raymond Gutierrez, who was nearby on the balcony. Cline told Carter that Gutierrez had been stealing his electricity.

Cline went into his apartment and returned with a .22 caliber rifle, which was missing the stock. Cline ducked back into the apartment for a couple seconds, stepped out again, and shot Gutierrez. Gutierrez was sitting in a chair on the balcony approximately 5 feet away, texting on his cell phone, when he was shot in the back of the head.

Carter testified that Cline went back into the apartment and returned to the balcony without the rifle. Releford stood up and asked Cline what he had done or why he had shot the neighbor, but Cline did not answer her questions. Carter asked Cline similar questions, but Cline only replied that he had not done anything. Carter testified that Cline "took off down the steps" after their brief conversation. Carter asked neighbors to call the police, but someone was using their telephone. Carter ran toward his own apartment to call the police himself but turned around and returned to the scene when he heard sirens and saw the flashing lights of emergency vehicles.

Carter spoke to the first police officer he saw, telling the officer where the paramedics were needed. He initially hesitated when asked if he had seen what happened but soon told the officer what he had observed. He later went with police to headquarters and gave a complete statement. About 2 hours after going to sleep, around 4 a.m., Carter received a telephone call from Cline, who was in jail. The recorded call, the content of which was generally consistent with Carter's testimony and Cline's statement to the police, was admitted at trial.

Officers found a .22 caliber rifle, missing the stock, under the bed in the bedroom of Cline's apartment. Even without the missing pieces (the "butt stock assembly," the "return spring," and the "return spring guide"), 6 pounds of trigger pull was required to fire the rifle, which put it within the acceptable limits for this type of weapon. A KBI forensic expert on firearms identification testified that any firearm that requires less than 2 pounds of trigger pull is an extremely light trigger, which requires special care in handling to prevent accidental discharges during testing.

Gutierrez died on September 24, 2007, 3 days after the shooting. The deputy coroner testified that the cause of Gutierrez' death was the gunshot wound to the head. Gutierrez also had minor injuries to his forehead and lower lip that the deputy coroner classified as acute injuries, or injuries that occurred relatively close in time to the gunshot wound.

Cline testified that he was high on PCP, to the point that he was in an altered reality, when he shot Gutierrez. He stated that, at the time of the shooting, he had believed that Gutierrez was somehow stealing his electricity. Cline said that he dropped the .22 caliber rifle in his room, left the apartment, and drove to his mother's house. Cline was arrested shortly after the shooting at his mother's house.

Additional trial facts are included in the analysis of each issue. The jury found Cline guilty of premeditated first-degree murder. Cline was sentenced to life imprisonment, without possibility of parole for 25 years. Cline timely appealed.

### EVIDENCE OF SPECIAL EDUCATION

During his opening statement, defense counsel stated: "The evidence is going to show that Bernard Cline is also low functioning on an intellectual level." The State objected shortly after that comment, but on the basis that defense counsel was making statements that would require Cline to testify. Later, in opening statements, defense counsel mentioned, without objection, that Cline was playing with a toy, a remote control car, in the street, which was "consistent with the level that he functions."

The State offered Cline's written waiver of rights as an exhibit; the waiver was admitted without objection. In the space labeled "Education" on the waiver form, an officer wrote "Completed 10th Grade"; however, immediately under that space in an unlabeled area of the form, he wrote "Wyandotte Mental Health." The State asked Officer Quinn the following:

"Q. . . . [O]n State's Exhibit 36 you mention this upper portion which includes name, date of birth, biographical information?
"A. Correct.
"Q. Would you agree? There's also a place for education?
"A. Correct.
"Q. Where does that information come from?
"A. Generally ask the person that we're talking to.
"Q. So you ask them, what? How far did you go in school, or—
"A. Correct.
"Q. So that information came from the defendant?
"A. Yes."

Officer Quinn testified that Cline told the officers he could not read. As a result, the officers orally read him the waiver form. The officers changed the wording on the form to indicate that the form had been read to Cline.

After the State rested, the State sought to limit Cline's testimony regarding his education to that contained on the waiver of rights form. Cline sought to present evidence that his tenth grade education was obtained through special education classes rather than regular classes. Cline argued that the State had opened the door to this evidence by presenting evidence that he had completed the tenth grade. The State claimed this evidence was an improper as-

sertion of diminished capacity or an unnoticed mental defect defense.

The trial court was aware, from the earlier suppression hearing, that Cline's intelligence quotient was measured at 57, which falls in the range of mild mental retardation. At the suppression hearing, a Larned doctor opined that an individual with this intelligence function could attain, with special education services and full support systems, about a sixth grade education. The judge ultimately ruled:

"[THE COURT]: You have a right to present the evidence as to what grade level he attained or went to. I don't have an issue, it's already in front of the jury that he is not able to read and write at a functional level, but we're not going to get into special ed and any of those issues, because you're getting into the mental disease or defect issue. He certainly has a right to explain the inconsistencies in his story, as any defendant would.

"[DEFENSE COUNSEL]: And what if that explanation is I'm just not that smart?

"[PROSECUTOR]: Then he can say that.

"[THE COURT]: That's fine, but he can't say I'm special ed."

Cline's testimony on his low intellectual functioning was limited to the following:

"[DEFENSE COUNSEL]: Sir, we heard evidence that you—you went to the 10th grade?

"[CLINE]: Yeah.

"[DEFENSE COUNSEL]: Can you read and write?

"[CLINE]: No."

Cline testified at some length about his addiction to PCP and his use of PCP on the day of the shooting. Cline described the effects of PCP on him that day as making him hallucinate and unaware of his surroundings, saying, "And I don't know what I be doing, and then I look at myself and I said what am I doing and I say I don't know." Cline presented expert testimony on the effects of PCP, which the doctor summarized as follows:

"PCP . . . will affect the interactions to the point in which one cell would interact with the other one, that PCP will disrupt it, and then will change how the brain then operates. It will then change how the brain sees things, perceives things, will change one's perception of one's self.

"That's why they call PCP a disassociative drug, it's because people experience disassociation. That's a sense of separation from themselves, they cannot even perceive themselves as being themselves, for instance, one of the biggest things that happens with this drug. It is also very unpredictable. A lot of other things can take place.

"People's judgment is disrupted. Sometimes they become extremely aggressive, extremely impulsive, unable to control their thoughts, ideas and impulses, and this drug will do all those kind of things to people, and a variety of things. One of the reasons why this drug is never used for humans [as an anesthesia or otherwise] is because it is so unpredictable as to what people will do when they are on this drug."

In closing arguments, defense counsel stated: "An irrational paranoia [like Cline's continued assertions that the victim stole his electricity] would indicate to any of us who are of average intelligence, like me, that something's wrong with this person's mind, that that person very well could be under the influence of drugs."

*Standard of Review*

"An appellate court generally reviews a trial court's decision on a motion in limine under an abuse of discretion standard. However, our first question when examining a district court's admission or exclusion of evidence is relevance. Once relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question."

"The circumstances surrounding the making of a confession or admission, including particulars regarding a defendant's psychiatric or psychological condition, may be submitted to a jury as bearing upon the credibility or the weight to be given to the confession or admission. A district judge has discretion to decide whether to admit evidence regarding such circumstances surrounding the making of the confession."

"A criminal defendant against whom a confession will be admitted may be permitted to introduce expert psychological or psychiatric testimony bearing on his or her ability to respond reliably to interrogation. It is essential, however, that the testimony actually tell jurors something they would not otherwise know from their usual human experience and that it remain hypothetical or theoretical. It must stop short of expressing the expert's judgment on the defendant's reliability in the specific instance of the confession submitted for the jury's consideration." *State v. Oliver*, 280 Kan. 681, Syl. ¶¶ 6-7, 9, 124 P.3d 493 (2005), *overruled on other grounds by State v. Anderson*, 287 Kan. 325, 197 P.3d 409 (2008).

*Analysis*

Cline argues that evidence of his placement in special education classes was necessary to rebut the State's evidence that he had a tenth grade education. Cline maintains that this evidence explained why he told a wide variety of stories to the investigating police officers. The State argues that this was an attempt to improperly introduce evidence of mental disease or defect, that the evidence was not proper rebuttal, and that the State did not open the door to this evidence during the officer's testimony.

In *Oliver*, this court stated: "It is obvious that evidence going to the credibility to be afforded a defendant's confession is relevant." 280 Kan. at 693. In this case, it is perhaps a bit less obvious how Cline's special education status explains why he told the police officers numerous stories about the shooting. The trial court ruled that Cline had the right to explain any inconsistencies in his story. The court allowed that Cline could say something like "I'm just not that smart" but Cline would not be allowed to say he was "special ed." When cross-examined about the inconsistent stories he told police, Cline testified that the different stories were because he was "high," "nervous," or "scared."

Cline's defense at trial was voluntary intoxication. He argued that he was so high on PCP at the time of the shooting that he was unable to form the premeditation required for first-degree murder or the intent required for both first- and second-degree murder. Cline presented expert testimony about the effects of PCP, including the changes to the brain that affect long-term function. Whether Cline completed the tenth grade in regular classes or special education classes was not particularly relevant to this defense. Arguably, the special education testimony would have been a plea for sympathy rather than rebuttal evidence or relevant evidence.

Further, the jury heard from both Cline and the interviewing officer that Cline was unable to read the waiver form. Cline testified that he was not able to write. Even without evidence that Cline took special education classes, the jury knew Cline did not have the basic skills one might expect from a person who completed the

tenth grade. As the State argues, the jury was unlikely to presume Cline had high or even average intelligence from the evidence that he completed the tenth grade.

On the other hand, this evidence is a part of the basic background information provided by any witness. Child witnesses are routinely asked what grade they have completed and if they have mastered certain skills—reading, writing, or math skills. Adult witnesses are frequently asked about their education, even when they are not testifying as experts. A person's educational background gives the jury an idea of how that person views and experiences the world, which helps jurors determine how much credibility to give each witness. As such, the evidence is relevant.

A trial judge has discretion to admit particulars of a criminal defendant's mental condition if the particulars are relevant to the credibility of the defendant's confession. *Oliver*, 280 Kan. 681, Syl. ¶ 7.

"Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. [Citation omitted.]" *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

Cline contends the trial court abused its discretion because it made an error of law by ruling that Cline could not present any evidence that related to his mental disease or defect because he had not provided notice of a mental disease or defect defense. The trial court's decision was not that clear cut. The court ruled that Cline had the right to explain the inconsistencies in his story and that Cline could give some indication of his intelligence if that was his explanation. The court only limited mention of special education. The court did not make a ruling on the State's potential objections to testimony or commentary that Cline was low functioning or developmentally disabled.

Under the facts of this case, the trial court did not abuse its discretion in excluding the testimony. There are numerous reasons

a student is placed in special education classes, many not pertaining to low intellectual functioning. Here, Cline did not offer any evidence or testimony that completion of the tenth grade in special education classes as opposed to any other classes had any bearing on his erratic behavior with the investigating officers. The trial court may have drawn the line more narrowly than necessary, but its decision was within wide range of latitude allowed for the admission of evidence.

## ADMISSIBILITY OF CLINE'S STATEMENT

During the trial, the State played a video of Cline's statement to police officers the night of the shooting. Cline objected to the video based on his pretrial motion to suppress his confession. During the statement, the officers reviewed several different stories Cline had given regarding Gutierrez' shooting including: (1) Cline claimed he was being set up by his girlfriend or her brother, (2) Cline claimed his girlfriend shot the victim, (3) Cline claimed the gun went off while he was fighting over the weapon with his girlfriend, (4) Cline claimed he had simply heard a bang and saw the victim fall over dead, and (5) Cline claimed he was holding the gun when he tripped over a speaker wire and the gun went off. When the police officers tried to clarify why Cline had told them so many different stories, Cline went into a rant about the firecrackers on his table, claimed the officers were trying to confuse him, and concluded by saying he was "through talking." The police officers immediately asked about another version of Cline's story, and Cline answered without suggesting that he no longer wished to talk to the officers.

At the suppression hearing before trial, Officer Quinn testified that he never heard Cline say he was "through talking" during the interview. Officer Quinn stated that if Cline had said something like that, the officers would have stopped the interview because he would have invoked his right to remain silent. The trial judge stated that he heard Cline say, "I'm through talking," on the video. The trial judge took the issue under advisement but "ruled" that the remainder of Cline's statement only reiterated his earlier story that

the shooting was accidental and explained that his initial lies were due to fear. Just prior to trial, the judge ruled:

"[T]he Court did take under advisement that part of the defendant's statement after it was—he reportedly stated that he was through talking.

"We did have a Denno hearing regarding that statement. The Court did allow the statement through that point. The Court has reviewed not only the statement but the applicable case law, and the detective testified under oath that he did not hear that the defendant said he was through talking.

"There was no appreciable delay in the continued questioning of the defendant at that point. He did basically reiterate and clarify what he had said up to that point. The interrogation continued only for a few more minutes, and so I do not find that the defendant reasserted his right to remain silent, and so I am going to allow that statement in the entirety."

## Standard of Review

"A determination that a statement was freely, voluntarily, and intelligently given will be upheld if there is substantial competent evidence to support such a conclusion. In making the factual review, the appellate courts will not reweigh the evidence and will give deference to the factual findings of the trial court. The legal conclusion drawn from those facts is subject to de novo review.

. . . .

"Under *Miranda*, a suspect must unambiguously request counsel so that a reasonable police officer in those circumstances would understand the statement to be a request for an attorney. The same rule applies to the right to remain silent. When a suspect makes a statement which is ambiguous as to whether the suspect is asserting a right to remain silent or to confer with counsel, the interrogator may but is not required to ask clarifying questions and may continue the questioning." *State v. Holmes*, 278 Kan. 603, Syl. ¶¶ 2, 4, 102 P.3d 406 (2004).

## Analysis

During pretrial motions, the trial court found that Cline's statements were voluntary considering the totality of the circumstances. The court specifically considered Cline's low intellectual functioning, substance use, behavior on camera, ability to respond to questions, and the consistency of Cline's story, as well as the fact that the officers read the *Miranda* warnings and wavier of rights individually to Cline more than once. The court considered the testimony of the Larned doctor, who said that Cline was able to articulate an understanding of his *Miranda* rights. On appeal, Cline challenges only the admission of the portion of his statement given

after he stated he was "through talking," rather than the voluntariness of his entire statement.

The trial court watched and listened to the video of Cline's interview and reviewed the disputed portion more than once. The interviewing police officer testified that he did not hear Cline say he was "through talking," either during the interview or while reviewing the video. The trial court found that Cline did say, "I'm through talking." Before trial, the court found that Cline only reiterated and clarified his earlier statements in the few minutes of the interview after he said he was through talking and there was no delay between the disputed comment and subsequent questioning. The trial court did not make a specific finding whether Cline invoked his right to remain silent; instead, the court jumped ahead to consider the subsequent statements.

In determining whether an invocation of a defendant's right to remain silent was clear and unambiguous, only the defendant's prior statements and the defendant's alleged statement of invocation maybe be considered. *State v. Donesay*, 265 Kan. 60, 67, 959 P.2d 862 (1998) (citing *Smith v. Illinois*, 469 U.S. 91, 105 S. Ct. 490, 83 L. Ed. 2d 488 [1984]). The defendant's post-invocation statements are not relevant to this determination. *Donesay*, 265 Kan. at 67. Here, the trial court erred by jumping ahead to consider Cline's statements after he stated he was through talking.

The State argues that any error in admitting these subsequent statements was harmless. The trial court found that after Cline made the disputed statement, he only repeated his previous description of events and stated that he lied to the police officers initially because he was scared. At trial, Cline testified that he told the officers various versions of his story because he was scared. Finally, the State alleges there was overwhelming evidence of Cline's guilt, including eyewitness testimony, the weapon recovered from under Cline's bed, and the shell casing found on the ground below the balcony. Regardless of whether Cline invoked his right to remain silent, we accept the trial court's finding that the final 3 and ½ minutes of the interview consisted of nothing more than repetition of Cline's earlier statements and was not prejudicial.

Our decision in *Ward*, 292 Kan. at 556-65, synthesized and clarified our caselaw on the definition and application of the harmless error standard applied to claims of constitutional error, concluding:

"[B]efore a Kansas court can declare an error harmless it must determine the error did not affect a party's substantial rights, meaning it will not or did not affect the trial's outcome. The degree of certainty by which the court must be persuaded that the error did not affect the outcome of the trial will vary depending on whether the error implicates a right guaranteed by the United States Constitution. If it does, a Kansas court must be persuaded beyond a reasonable doubt that there was no impact on the trial's outcome, *i.e.*, there is no reasonable possibility that the error contributed to the verdict. If a right guaranteed by the United States Constitution is not implicated, a Kansas court must be persuaded that there is no reasonable probability that the error will or did affect the outcome of the trial." *Ward*, 292 Kan. at 565.

The State, as the party benefitting from the error, has the burden of proving the error was harmless. *Ward*, 292 Kan. at 568-69. The State has proven beyond a reasonable doubt that any error in the admission of these statements did not affect Cline's substantial rights and did not contribute to the verdict obtained. Therefore, we conclude that any error was harmless.

Affirmed.