IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 104,181

STATE OF KANSAS,
*Appellee*,

v.

MARK T. SALARY,
*Appellant.*

SYLLABUS BY THE COURT

1.

For jury instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* __ U.S. __, 132 S. Ct. 1594 (2012).

2.

When an appellate court reviews a trial court's refusal to instruct on defendant's theory of defense, the court considers that defendant is entitled to instructions on the law applicable to that theory if there is evidence to support it. However, there must be evidence which, viewed in the light most favorable to the defendant, is sufficient to justify a rational factfinder finding in accordance with that theory.

1

3.

It is the duty of the trial court to instruct the jury on self-defense so long as there is evidence tending to establish self-defense. However, K.S.A. 21-3214(3) provides that the justification for using force in self-defense is not available to a person who otherwise initially provokes the use of force against himself or another, unless certain circumstances exist.

4.

Voluntary manslaughter is a lesser included offense of first-degree murder per K.S.A. 21-3107(2)(a).

5.

Under K.S.A. 21-3403(b), voluntary manslaughter based on a theory of imperfect self-defense requires an intentional killing that is committed with an unreasonable but honest belief that the circumstances justify deadly force to defend against an aggressor's imminent use of unlawful force under K.S.A. 21-3211.

6.

When reviewing a challenge to the admission of a defendant's confession the appellate court reviews the factual underpinnings of the decision by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard. But when the facts material to a trial court's decision on a motion to admit or suppress evidence are not in dispute, the question of whether to suppress is a question of law over which an appellate court exercises unlimited review.

7.

The Fifth Amendment to the United States Constitution guarantees the right against self-incrimination, including the right to have a lawyer present during custodial interrogation and the right to remain silent.

8.

Invocation of the *Miranda* right to counsel requires some statement by the accused that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police. An objective standard is applied in determining if the statement can reasonably be construed to be an expression of a desire for the assistance of an attorney. If the desire for counsel is presented with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney, no ambiguity or equivocation exists, and all questions must cease.

9.

Once the right to counsel has been invoked, questioning can be resumed only after a lawyer has been made available or the suspect reinitiates conversation.

10.

In determining whether an invocation of a defendant's right to remain silent was clear and unambiguous, only the defendant's prior statements and the defendant's alleged statement of invocation may be considered. The defendant's post-invocation statements are not relevant to this determination.

11.

The statutory procedure for imposing a hard 50 sentence as provided in K.S.A. 21-4635 violates the Sixth Amendment to the United States Constitution as interpreted in

*Alleyne v. United States,* 570 U.S. __, 133 S. Ct. 2151, 2155, 2160-63, 186 L. Ed. 2d 314 (2013), because it permits a judge to find by a preponderance of the evidence the existence of one or more aggravating factors necessary to impose an increased mandatory minimum sentence, rather than requiring a jury to find the existence of the aggravating factors beyond a reasonable doubt.

Appeal from Wyandotte District Court; J. DEXTER BURDETTE, judge. Opinion filed March 13, 2015. Convictions affirmed, sentence vacated, and case remanded with directions.

*Richard P. Klein*, of Olathe, was on the brief for appellant.

*Sheryl L. Lidtke*, chief deputy district attorney, *Jerome A. Gorman*, district attorney, and *Derek Schmidt*, attorney general, were on the briefs for appellee.

The opinion of the court was delivered by

NUSS, C.J.:  Mark Salary appeals his convictions of first-degree premeditated murder and arson arising out of the shooting of his uncle and the accompanying house fire. Salary alleges the district court erred in denying his requests to instruct the jury on self-defense and on murder's lesser included offense of voluntary manslaughter based on a theory of imperfect self-defense. He also claims the court erred in admitting into evidence his recorded confession and in imposing a hard 50 life sentence. As a result, he claims his convictions should be reversed and his case remanded to the district court.

We hold any error related to the jury instructions and his recorded confession was harmless. We therefore affirm his convictions. But Salary's hard 50 sentence must be vacated and remanded for resentencing per *Alleyne v. United States*, 570 U.S. __, 133 S.

4

Ct. 2151, 186 L. Ed. 2d 314 (2013), and this court's later decision in *State v. Soto*, 299 Kan. 102, 322 P.3d 334 (2014).

FACTS AND PROCEDURAL HISTORY

Mark Salary admittedly shot and killed his uncle Valray "Joe" Estell in Estell's living room in Kansas City, Kansas. Salary had lived with his uncle for about 2 years. And for about 2 weeks before the shooting, Salary's friend Rosalind Haskins had also been staying there.

Haskins testified that Salary was cleaning a handgun in his bedroom before they went to bed the night before the shooting. According to Haskins, this was the only time she had ever seen Salary with a gun. The next morning while they were sitting in the bedroom, she noticed the gun was in his pocket. Salary told her that she would need to leave the house when he told her to do so. Soon after, Haskins dressed and went outside to wait for her boss to take her to work.

Haskins further testified that before she went outside, Salary and Estell got into a disagreement because Salary had refused to talk to his grandmother on the telephone that morning. She noticed Salary had gone into the living room to discuss the call with his uncle. About 15 minutes after Haskins went outside, she came back in the house to call her boss. Salary and Estell were still discussing the phone call, with Estell sitting in a recliner in the living room and Salary standing in front of him. Salary's handgun was then in his left hand, hanging at his side.

Haskins testified Salary asked her why she was still there so she went back outside. About 5 minutes later, she heard five gunshots "one right after the other" coming from the house. She ran to the neighbor's house across the street and asked him to check on Estell.

5

When the neighbor knocked on Estell's door, Salary opened it a crack and told him everything was fine and to go back home. A few minutes after the neighbor returned home, he observed smoke coming out of both ends of Estell's house. After he called 911, he and Haskins saw Salary walking down the street away from Estell's house.

Fire Department Captain Larry Grissom testified he was the first firefighter to enter the house, which was filled with smoke from an active fire. Grissom found Estell with his upper torso and his face down on the living room couch and his knees and feet on the floor. Grissom testified that Estell's back and legs were badly burnt.

According to Grissom, he and another firefighter carried Estell onto the lawn where they began CPR. Estell was not breathing and had no pulse. But he did have several gunshot wounds.

The autopsy pathologist testified he found a total of 10 gunshot wounds and removed 7 bullets from Estell's body. But he could not determine the order of the shots. According to the pathologist, the bullets traveled in various directions, indicating Estell was moving around during the shooting. Most of the shots came from Estell's left side or from behind him.

Police officers found Salary's Star 9mm semiautomatic pistol on the kitchen counter with one round in its chamber and five rounds in its magazine. They also found 11 Winchester-brand 9mm shell casings in various places around the living room and kitchen and outside the house. Salary's pistol was capable of holding 17 rounds.

Police additionally found a box of ammunition containing 16 9mm rounds near Salary's bed, plus 1 expended bullet which had traveled through Estell's living room

6

couch and lodged in the wall behind it. While the police also found one Winchester-brand .45 caliber shell casing on a kitchen windowsill, no guns were found in the house other than Salary's Star 9mm semiautomatic pistol.

The day after the shooting, Salary turned himself in to law enforcement. He was *Mirandized* and questioned by Detectives Steve Owens and Bryan Block at the Kansas City, Kansas, Police Department. After this "pre-interview" in which Salary admitted to shooting Estell, he agreed to make a recorded statement. He was again *Mirandized* and again admitted to shooting Estell. Owens later testified about the pre-interview, and the recorded statement was played to the jury.

Salary pled self-defense to the charge of first-degree premeditated murder and testified on his own behalf. In describing Estell, Salary testified his uncle was addicted to crack-cocaine, was aggressive when he was smoking it, and was even more aggressive, angry, and agitated when he was not. Salary also said that Estell kept several guns in the house and owned a bulletproof vest.

Salary's version of the salient events varied somewhat from the version presented by the State. He testified he and Estell had argued about money the night before the shooting. According to Salary, Estell was upset with him because Salary wanted to use their last $20 to buy food while Estell wanted to use it to buy crack.

The next morning, Estell was "really upset" because Salary would not speak to Salary's grandmother on the phone. Salary testified that as a result, Estell told him he needed to leave the house right away. Salary did not want to leave, though, because it was raining, and he was afraid Estell either would throw out on the curb everything Salary owned—guitars, amplifiers, computers, and Playstations—or else sell these possessions to buy crack. Salary testified Estell specifically told him, "Either you're

7

gonna walk out or you're gonna get carried out, but one way or another, your ass is leaving right now, today."

Salary testified he was not angry with Estell that morning but that he "knew something was gonna happen." According to Salary, "I thought we was gonna fight, fist fight." He also testified that when he had left his bedroom he noticed "what looked like to be a gun under his [Estell's] shirt when I came out and he was sitting in his chair. He had a cover over his lap and he had his hands under his lap and I could see something black and silver hanging out of his pocket." He clarified on cross-examination that the black and silver object was hanging out of the right-hand chest pocket on Estell's coveralls.

When Salary's lawyer asked him if he had fired his own gun, Salary answered:

> "Yes, I did. When he started to come at me, he started to come at me putting his hands out of his pocket and I thought he was about to pull a gun right then. So I pulled it [Salary's gun] and I fired. And he kept coming at me and I'm thinking he got the bulletproof vest on. It's not hurting him none. So I kept on firing not knowing that it was getting through."

Salary testified that he had five armor piercing rounds in his pistol, "And I figured they'll go through the vest." He also testified he believed Estell was wearing the vest under Estell's coveralls. When asked by his counsel if he had intended to kill Estell before he thought he saw Estell pulling a gun, Salary answered "no." The police did not find a bulletproof vest—or evidence of the existence of one—in the house or on Estell.

As for the fire, Salary testified that it started when Estell fell over a propane heater in the living room during the shooting. Salary said he could have stomped out the accidental fire, but instead he decided to spread it with a butane torch because he knew his uncle wanted to be cremated and thought the fire would "purify [Estell's] soul." But

during the pretrial investigation, Salary told the detectives he had started the fire after pouring kerosene over Estell's body. And fire investigators concluded the fire had been intentionally set, which confirmed Salary's pretrial statement.

A jury convicted Salary of one count of first-degree premeditated murder and one count of arson. This court has jurisdiction over his direct appeal under K.S.A. 2014 Supp. 22-3601(b)(3), (4) (life imprisonment, off-grid crime).

Other facts will be added as necessary to the analysis.

ANALYSIS

Issue 1: *The district court did not err in denying Salary's request for a jury instruction on self-defense.*

Salary asked the district court to instruct the jury on self-defense, but the court denied his request. Salary now claims the denial was reversible error. The State responds there was no error but, if any, it was harmless.

*Standard of review*

This court uses a stair-step process for analyzing jury instruction issues on appeal. As we recently clarified in *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012):

"For jury instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to

9

the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* __ U.S. __, 132 S. Ct. 1594 (2012)."

Because the State correctly concedes Salary preserved the self-defense instruction issue for appellate review, the first step of the *Plummer* analysis is satisfied. So we may proceed to the merits for this instruction.

*Discussion*

We begin by acknowledging a self-defense jury instruction can be legally appropriate for a charge of first-degree murder. See, *e.g.*, *State v. Jackson*, 262 Kan. 119, 122-23, 936 P.2d 761 (1997). With the second step of the *Plummer* analysis satisfied, we now turn to whether there is factual support for the instruction. For this standard of our review, we have repeatedly held that

"'[a] defendant is entitled to instructions on the law applicable to his or her theory of defense if there is evidence to support the theory. However, there must be evidence which, viewed in the light most favorable to the defendant, is sufficient to justify a rational factfinder finding in accordance with the defendant's theory."' *State v. Anderson*, 287 Kan. 325, 334, 197 P.3d 409 (2008).

We have further held that "[a]s with any issue, the evidence of the defendant's theory of defense certainly can be supported only by his or her own testimony." 287 Kan. at 334. But the defendant's testimony alone is not necessarily dispositive of the issue. 287 Kan. at 336.

Simply put, even when viewed in the light most favorable to the defendant, there still must be sufficient evidence for a rational factfinder to find in accordance with the proffered theory of defense. See *State v. Roeder*, 300 Kan. 901, 919-26, 336 P.3d 831 (2014) (considering evidence outside defendant's testimony to determine no entitlement to instruction on defense-of-others theory of defense); *Anderson*, 287 Kan. at 334 (considering evidence outside defendant's testimony to determine no entitlement to instruction on compulsion theory of defense).

With these factual standards established, we turn to the required legal elements— for which there must be sufficient factual support—to establish the right to use deadly force in self-defense. These elements are set out in K.S.A. 21-3211:

> "(a) A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such force is necessary to defend such person . . . against such other's imminent use of unlawful force.

> "(b) A person is justified in the use of deadly force under circumstances described in subsection (a) if such person reasonably believes deadly force is necessary to prevent imminent death or great bodily harm to such person . . . ."

These subsections establish a two-part test, the first of which is subjective. It requires a showing that the defendant sincerely and honestly believed the use of deadly force in defense of self was necessary. The second part is objective. It requires a showing that a reasonable person in the defendant's circumstances would have perceived the use of deadly force in defense of self was necessary. See *State v. Friday*, 297 Kan. 1023, 1037, 306 P.3d 265 (2013).

In denying Salary's request for a self-defense instruction, the district court primarily found the objective requirement of the test was not met. It reasoned:

"All of the evidence, all of the objective evidence, all of the factual evidence would support that this was an intentional killing by the defendant of the victim, that the victim was not armed, that the defendant did not believe the victim was going to cause him any harm, and that the . . . defendant was not acting in self-defense. He was the aggressor and it was an intentional killing. . . . [A]ny reasonable person looking at the totality of these circumstances could not conclude that the defendant is entitled to a self-defense instruction."

Salary concedes there "certainly was evidence to support the district court's version of the events." But he argues that by considering the evidence under the "totality of the circumstances," the district court made an improper credibility determination and failed to consider the evidence in the light most favorable to him. More specifically, Salary contends the district court improperly relied on some of this court's precedent suggesting the objective requirement of the self-defense test is to be evaluated under the totality of the circumstances. See *State v. Gonzales*, 282 Kan. 73, 145 P.3d 18 (2006).

The State responds that the objective requirement of the test cannot be satisfied by relying on Salary's own uncorroborated assertions. Alternatively, it contends Salary is not entitled to a self-defense instruction because the facts demonstrate he was the initial aggressor as identified in K.S.A. 21-3214, and he cannot meet that statute's exceptions.

We address the State's latter argument first because we conclude it is dispositive. K.S.A. 21-3214(3) provides that an aggressor, *i.e.*, one who initially provokes the use of force against himself or herself, may claim self-defense under K.S.A. 21-3211 only in limited circumstances. See *Jackson*, 262 Kan. at 123. That statute states in relevant part:

"The justification described in section[] 21-3211 . . . is not available to a person who:

12

. . . .

"(3) [I]nitially provokes the use of force against himself or another, *unless*:

(a) He has reasonable ground to believe that he is in imminent danger of death or great bodily harm, *and* he has exhausted every reasonable means to escape such danger other than the use of force which is likely to cause death or great bodily harm to the assailant; or

(b) In good faith, he withdraws from physical contact with the assailant and indicates clearly to the assailant that he desires to withdraw and terminate the use of force, but the assailant continues or resumes the use of force." (Emphasis added.) K.S.A. 21-3214.

So before we apply the two-part test outlined in the self-defense statute, K.S.A. 21-3211, and discussed in *Friday*, 297 Kan. at 1037, we first consider if the facts show Salary was eligible to receive such an instruction under K.S.A. 21-3214.

In this analysis, we are required to examine the evidence in the light most favorable to Salary. See *Anderson*, 287 Kan. at 334. Accordingly, we start by observing it is uncontroverted that Salary and Estell had a disagreement in the living room about Salary's refusal to speak with his grandmother on the telephone.

Haskins testified without contradiction that Salary went into the living room to discuss the call with Estell before she went outside and that they were still discussing it when she came back in to check on her ride. She further testified without contradiction that Salary's gun was no longer in his pocket but in his left hand hanging at his side while he stood directly in front of the seated Estell.

13

Salary confirmed that Estell was upset with him because he refused to talk to his grandmother. And while he further testified he was not mad at Estell, he nevertheless "knew something was gonna happen." According to Salary, when he entered the living room that morning he noticed Estell had "what looked like to be a gun" in his coveralls pocket, and he thought Estell was wearing a bulletproof vest. He did not expressly testify that he—or anyone else—actually saw Estell with a handgun. But Salary admitted that he brought his loaded 9mm handgun from his bedroom and kept the gun with him throughout this discussion.

More importantly, Salary testified Estell specifically told him he had to leave Estell's house that day—either voluntarily or otherwise—when he said, "Either you're gonna walk out or you're gonna get carried out, but one way or another, your ass is leaving right now, today."

According to one part of Salary's testimony, he chose not to "walk out." He simply refused to obey Estell's order to leave, when leaving would have ended any confrontation—actual, potential, or imagined. He instead chose to stay in Estell's living room with a handgun at his side to stop the remaining alternative from happening, *i.e.*, to "get carried out" by a man he believed to be armed and protected by a bulletproof vest. Moreover, Salary admitted on cross-examination that he never gave Estell a chance to pull a gun because Salary pulled first and shot him.

Under these uncontroverted facts, Salary's choice easily could be characterized as a provocation of any later show of force allegedly displayed by Estell—coming at Salary while pulling his hands out of his pockets or from underneath a lap cover. This particular choice necessarily eliminates the factual basis for a self-defense instruction. See *State v. Cook*, 286 Kan. 1098, 1105-06, 191 P.3d 294 (2008) (no entitlement to self-defense instruction where defendant refused to leave the victim's residence upon demand;

14

defendant was allegedly the aggressor; victim was in a position to lawfully defend his own dwelling under K.S.A. 21-3212; one could find that defendant provoked such show of force as victim may have displayed; and defendant made no attempt to escape or to withdraw from contact with the victim under K.S.A. 21-3214[3]); *cf. Jackson*, 262 Kan. at 123 (no entitlement to self-defense instruction where defendant refused order to leave nightclub and shot three people who attempted to enforce the order; although there was evidence one victim had a gun, there was no testimony he fired the gun; and defendant was initial aggressor who made no effort to withdraw, escape, or avoid the killings under K.S.A. 21-3214[3]).

Any possible doubt about the lack of a factual basis for Salary's self-defense instruction is erased by yet another part of his uncontroverted testimony. According to Salary, after receiving Estell's ultimatum either to walk out or get carried out, he initially chose to leave the house. He actually left Estell in the living room, returned to his bedroom, and began packing his bags. But after overhearing Estell's phone conversation with Salary's mother, Salary changed his mind and returned to the living room:

> "So when he [Estell] told me that all my stuff going out on the curb, I initially went in my room and started to—to repack my stuff. But then when my mama called—well, he called my mama and told her that all my stuff was going out on the curb and I'm getting out right there, I went back into the room to discuss my stuff."

According to Salary's own testimony, he returned to the living room with his loaded 9mm semiautomatic handgun to face a man he believed was packing a handgun, wearing a bulletproof vest, and who had just told Salary if he did not voluntarily leave the house that day, he would "get carried out," *i.e.*, be killed.

15

Under these uncontroverted facts—leaving a confrontation with an individual and then returning with a loaded firearm and shooting that same person—Kansas caselaw declares the defendant typically is ineligible for a self-defense instruction. We find guidance in *State v. Harmon*, 254 Kan. 87, 91, 865 P.2d 1011 (1993). There, we stated that after defendant left his first confrontation with his brother and came back with a revolver:

> "[T]he defendant . . . was the aggressor. He went looking for his brother with a loaded gun for the express purpose of shooting his brother 'if [he] had to.' Even with the defendant's testimony that his brother threatened him verbally, was hostile and still angry, and lunged at the defendant with his hands in the air, the defendant, as the aggressor, was not entitled to use deadly force in self-defense unless he had exhausted every other reasonable means to escape the danger he perceived. *State v. Rutter*, 252 Kan. 739, 747, 850 P.2d 899 (1993)." 254 Kan. at 91.

See also *State v. Meyers*, 245 Kan. 471, 477, 781 P.2d 700 (1989) (exception under K.S.A. 21-3214[3] not available when after first confrontation, defendant left, retrieved a rifle, and returned to shoot the victim, *i.e.*, "defendant could have avoided fatal confrontation" by staying away); *cf. State v. McCullough*, 293 Kan. 970, 976, 270 P.3d 1142 (2012) (defendant's request for self-defense instruction correctly denied when defendant left scene of fistfight to retrieve knife and returned to fatally stab victim).

Under these authorities and after reviewing the evidence in the light most favorable to Salary, we conclude he was not entitled to an instruction on self-defense as set forth in K.S.A. 21-3211. The district court did not err in denying Salary's request to give it.

Issue 2: *Any district court error in denying Salary's request for a voluntary manslaughter instruction based on a theory of imperfect self-defense was harmless.*

Salary argues the district court committed reversible error when it refused to give his requested jury instruction for voluntary manslaughter based on a theory of imperfect self-defense. The State responds there was no error but, if any, it was harmless.

*Standard of review*

As previously noted, our standard of review is the stair-step analysis set forth in *Plummer*, 295 Kan. 156, Syl. ¶ 1. Because the State correctly concedes Salary preserved the voluntary manslaughter instruction issue for appellate review, the first step of the *Plummer* analysis is satisfied. We therefore may proceed to the merits.

*Discussion*

We begin by acknowledging voluntary manslaughter is a lesser included offense of premeditated first-degree murder per K.S.A. 21-3107(2)(a). So Salary's request for an instruction on voluntary manslaughter based on a theory of imperfect self-defense was legally appropriate. See *State v. Qualls*, 297 Kan. 61, 69, 298 P.3d 311 (2013). This particular type of voluntary manslaughter is an "intentional killing of a human being committed . . . upon an unreasonable but honest belief that circumstances existed that justified deadly force under K.S.A. 21-3211 . . . and amendments thereto." K.S.A. 21-3403(b); see *Cook*, 286 Kan. at 1107. So the second step of the *Plummer* analysis—legal appropriateness—is satisfied.

The parties offer a variety of competing reasons why the requested instruction was or was not factually appropriate and whether any actual error was reversible. As this court did in *Cook*, we will bypass the third step of the *Plummer* analysis and move

17

straight to the harmlessness inquiry. See 286 Kan. at 1107. In other words, we will assume—without deciding—that when the evidence is viewed in the light most favorable to Salary, it was sufficient for a rational factfinder to find for him on his theory of imperfect self-defense. See *Anderson*, 287 Kan. at 334. Accordingly, we assume it was error not to give the instruction.

Our standard for determining harmlessness of the error depends upon whether the error is constitutional or unconstitutional. *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011), *cert. denied* __ U.S. __, 132 S. Ct. 1594 (2012). The State argues that the district court's failure to instruct on voluntary manslaughter does not implicate a constitutional right but a statutory one. In support, the State points out it is only a statute, K.S.A. 22-3414(3), that requires a district court to instruct on a lesser included offense when the evidence would reasonably justify a conviction of the lesser included offense.

Accordingly, the State contends that *Ward*'s nonconstitutional harmless error test applies: the "court must be persuaded that there is no reasonable probability that the error will or did affect the outcome of the trial." 292 Kan. at 565. More specifically, the State argues there was no reasonable probability the error affected the verdict because of the overwhelming evidence supporting Salary's first-degree premeditated murder conviction.

We agree the nonconstitutional harmlessness test applies and now proceed to apply it to our facts. See *Roeder*, 300 Kan. at 937 (indicating failure to instruct on lesser included offense did not rise to the level of constitutional error).

In *Qualls*, we determined that the level of evidence would not permit passing either the constitutional or nonconstitutional harmless error tests for failure to instruct. We stated: "This result [reversal] is driven by the evidence of premeditation, which was sufficient to support the jury's verdict of first-degree premeditated murder *but was not so*

18

*'abundant' as to convince us that the requested voluntary manslaughter should have been rejected."* (Emphasis added.) 297 Kan. at 72.

Similar to the situation in *Qualls*, Salary defended on the basis he shot Estell because he believed Estell was about to pull a gun on him. So the voluntary manslaughter instruction based on imperfect self-defense clearly comported with his theory. But unlike the situation in *Qualls*, there is exceptionally strong evidence of premeditation, which Salary does not challenge on appeal. And the strength of this particular evidence leads us to conclude that, even if there was sufficient evidence to require an instruction on voluntary manslaughter based on imperfect self-defense, there was no reasonable probability that the failure to so instruct affected the ultimate verdict for premeditated first-degree murder. *Ward*, 292 Kan. at 565.

This court recently reiterated several points about the use of circumstantial evidence to determine premeditation in *State v. Kettler*, 299 Kan. 448, 466-67, 325 P.3d 1075 (2014):

> "Premeditation means to have thought the matter over beforehand and does not necessarily mean an act is planned, contrived, or schemed beforehand; rather, premeditation indicates a time of reflection or deliberation. *State v. Qualls*, 297 Kan. 61, Syl. ¶ 2, 298 P.3d 311 (2013); *State v. Holmes*, 278 Kan. 603, 632, 102 P.3d 406 (2004); see PIK Crim. 3d 56.04(b). Further, it is not necessary that there be direct evidence of either intent or premeditation. Instead, premeditation, deliberation, and intent may be inferred from the established circumstances of a case, provided the inferences are reasonable. *State v. Scaife*, 286 Kan. 614, 617, 186 P.3d 755 (2008). In other words, '[i]ntent . . . may be shown by circumstantial evidence, and a person is presumed to intend all the natural consequences of his acts. [Citation omitted.]' *State v. Childers*, 222 Kan. 32, 37, 563 P.2d 999 (1977)."

19

The *Kettler* court also confirmed a list of factors to consider when determining premeditation from circumstantial evidence:

>"In considering circumstantial evidence, Kansas caselaw identifies factors to consider in determining whether the evidence gives rise to an inference of premeditation that include: '(1) the nature of the weapon used; (2) lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless. [Citation omitted.]' *Scaife*, 286 Kan. at 617-18; see *State v. Marks*, 297 Kan. 131, 140, 298 P.3d 1102 (2013). But the analysis of what inferences can be reasonably drawn is not driven by the number of factors present in a particular case because in some cases one factor alone may be compelling evidence of premeditation. See *State v. Cook*, 286 Kan. 1098, 1102, 191 P.3d 294 (2008); *State v. Morton*, 277 Kan. 575, 582-83, 86 P.3d 535 (2004) (evidence to support second and third factors sufficient in finding premeditation). Use of a deadly weapon by itself, however, is insufficient to establish premeditation. *State v. Cosby*, 293 Kan. 121, 134, 262 P.3d 285 (2011)." 299 Kan. at 467.

Here, several of the factors for inferring premeditation are clearly applicable. Regarding the first factor, *i.e.*, the nature of the weapon used, Salary used a 9mm semiautomatic handgun loaded with five armor piercing bullets—among other rounds—to put multiple bullet holes in Estell.

As for the third factor—Salary's conduct before and after the killing—Haskins' and Salary's testimony established that Salary cleaned and loaded his handgun in his bedroom the night before he used it to shoot Estell. Haskins further testified that although she had been living in the house with Salary for 2 weeks, this was the first time she had ever seen him with a gun. The next morning Haskins saw the gun in his pocket in the bedroom.

Salary then told Haskins before he went into the living room to see Estell that she needed to leave the house when he told her to do so. When she returned to the house to call her boss, he essentially again told her—this time from the living room in Estell's presence—she needed to leave. He asked her why she was still there, so she left again. The shooting occurred 5 minutes later.

Additionally, that morning Salary carried his handgun from his bedroom to the living room and, apparently after taking it from his pocket, held it by his side during the conversation with Estell. Salary also testified he thought the five armor piercing bullets he had loaded in his pistol would penetrate the bulletproof vest that he believed Estell was wearing. So he kept on shooting his pistol: "I'm thinking he got the bulletproof vest on. It's not hurting him none. So I kept on firing not knowing that it was getting through." Estell was found with 10 bullet holes in his body, with most of the shots coming from his left side or from behind him—not from facing Salary.

Salary admittedly did testify at one point that he chose to leave the living room face-off with his uncle, returned to his bedroom, and began to pack. Arguably this conduct dilutes the strong evidence of premeditation demonstrated by his actions to that point, *e.g.*, cleaning and then loading his pistol with some armor piercing ammunition the night before.

But Salary's related testimony provides additional circumstantial evidence of premeditation. For after overhearing Estell on the telephone, he apparently retrieved his loaded handgun and soon returned to the living room to confront his uncle—who he believed to be carrying a handgun and wearing a bulletproof vest. His voluntary return— seemingly, without any provocation whatsoever—culminated in the fatal shots. See 299 Kan. at 467 (lack of provocation another factor in inferring premeditation). So there is not only strong evidence of premeditation but, in turn, there is also scant evidence of Salary's

21

alleged honest belief that he needed to employ deadly force under these circumstances. See *Cook*, 286 Kan. at 1107.

Accordingly, we hold this strong evidence of premeditation—coupled with scant evidence of Salary's honest belief that his deadly force was justified under these circumstances—rendered harmless the error we assume the district court may have committed in failing to instruct on voluntary manslaughter. Simply put, there was no reasonable probability that the presumed error affected the outcome of the trial. *Ward*, 292 Kan. at 565.

Issue 3: *The district court erred in admitting Salary's recorded confession when Salary unambiguously invoked his right to have counsel present during custodial interrogation; but this error was harmless.*

Salary objected to the admission into trial evidence of his recorded confession, arguing the interview should have stopped because he told law enforcement he wanted a lawyer. The district court permitted the State to elicit testimony from Detective Owens about the interrogation and to play the recorded confession for the jury. Salary claims the confession's admission was reversible error.

The State responds there was no error but, if any, it was harmless.

*Standard of review*

An appellate court reviews the district court's decision to admit a defendant's confession into evidence using a bifurcated standard. *State v. Tahah*, 293 Kan. 267, 280, 262 P.3d 1045 (2011). "Without reweighing the evidence, the district court's findings are reviewed to determine whether they are supported by substantial competent evidence. The ultimate legal conclusion regarding the suppression of evidence is then reviewed

22

using a de novo standard." *State v. Bridges*, 297 Kan. 989, 1001-02, 306 P.3d 244 (2013). When the facts material to a trial court's decision on a motion to admit or suppress evidence are not in dispute, the question of whether to suppress is a question of law over which an appellate court exercises unlimited review. 297 Kan. at 1002.

Here, the material facts are not in dispute, so we exercise de novo review.

*Discussion*

After Detective Owens gave Salary *Miranda* warnings, Salary said that he understood them and signed a waiver of his rights. Salary answered questions for about an hour during what law enforcement characterized as a pre-interview.

At the end of the pre-interview, Salary agreed to give a formal recorded statement. Detective Owens gave *Miranda* warnings a second time, during which Salary said that he wanted a lawyer. At the hearing on the State's motion to admit Salary's statement, Owens described Salary's request in the following exchange with the prosecutor:

> "Q: [W]hile you were questioning him, at any point in time, did the defendant ask that the—that he have a lawyer present during the interrogation?

> "A: He never asked that he wanted a lawyer right *now*. During the second— during the videotaped statement, I went over the advice of rights again. During going over the advice of rights, he—when I asked him about having an attorney present, he said, well, I—something to the fact, I—*I do want a lawyer*. And I said, but you're willing to speak to me *now* without a lawyer present, correct? He said, yes. And he was inferring that he wanted a lawyer *later*, but not right *now*.

> "Q: Okay. So if and when charges got filed, he wanted to let you know he definitely wanted a lawyer *then*?

23

"A: Yes.

"Q: But you asked him specifically did he want a lawyer *before* he talked to you and his answer was no?

"A: Correct." (Emphasis added.)

Salary acknowledges that whether the district court erred in admitting his recorded statement at trial turns on whether his comments, "I do want a lawyer," was an unequivocal invocation of his right to have the assistance of counsel during the interrogation. While Salary argues his request was clear, the State contends the statement was ambiguous because of the circumstances of the interrogation. In short, the State argues Salary had waived his right to have counsel present during the pre-interview, confessed during the pre-interview, and agreed to make a recorded statement before he said he wanted a lawyer.

It is well settled that the Fifth Amendment to the United States Constitution guarantees the right against self-incrimination, including the right to remain silent and the right to have an attorney present during custodial interrogation. *State v. Walker*, 276 Kan. 939, 944, 80 P.3d 1132 (2003) (citing *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 [1966]). We have held that if the accused has unambiguously invoked the right to counsel, questioning must cease immediately and may be resumed only after a lawyer has been made available or the accused reinitiates the conversation with the interrogator. *Walker*, 276 Kan. at 946. But if the accused's request is ambiguous, the interrogator may ask clarifying questions. 276 Kan. at 945.

We have held the right to counsel may be invoked at any time. *Walker*, 276 Kan. at 944. And if the accused successfully invokes the right to counsel, all statements made

24

after the invocation of the right must be suppressed. See 276 Kan. at 940. To successfully invoke the right, the accused must, at a minimum, make "'some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police.'" 276 Kan. at 944 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178, 111 S. Ct. 2204, 115 L. Ed. 2d 158 [1991]). There are two aspects to this rule:

"First, the suspect 'must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.' [*Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 2357, 129 L. Ed. 2d 362 (1994)]. Second, the request must be for assistance with the custodial interrogation, not for subsequent hearings or proceedings. *McNeil*, 501 U.S. at 178." *Walker*, 276 Kan. at 945.

The court applies an objective standard under the first part of the rule to determine if the accused's statements "'"can reasonably be construed to be an expression of a desire for the assistance of an attorney."' *Davis*, 512 U.S. at 459 (quoting *McNeil*, 501 U.S. at 178)." *Walker*, 276 Kan. at 945. "If the desire for counsel is presented 'sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney,' no ambiguity or equivocation exists, and all questions must cease. *Davis*, 512 U.S. at 459." *Walker*, 276 Kan. at 945.

In considering whether the second part of the rule has been satisfied, the court may look at "[t]he timing as well as the content and context of a reference to counsel [to] help determine whether there has been an unambiguous assertion of the right to have the assistance of an attorney in dealing with a custodial interrogation by law enforcement officers." *State v. Appleby*, 289 Kan. 1017, 1051, 221 P.3d 525 (2009).

25

Salary's statement, "I do want a lawyer," is an unambiguous statement that """can reasonably be construed to be an expression of a desire for the assistance of an attorney.""" See 276 Kan. at 945; *contra Davis*, 512 U.S. at 462 (defendant's remark, "'Maybe I should talk to a lawyer,'" not a clear invocation of right to counsel). So the rule's first requirement has been met.

In turning to the rule's second requirement, we initially observe the context in which this comment was made appears to support Salary's argument that he was asking to have a lawyer present during the interrogation, not a subsequent proceeding.

In admitting Salary's recorded confession, the district court considered the circumstances in which Salary requested a lawyer. It held that his request "merely indicates to this court, based on the evidence, that he couldn't afford his own attorney, but he could probably get one later after charges were filed against him. He did consent to continued speaking with the detective." But other than Salary's consent to continue the interview after he said he wanted a lawyer, the district court did not explicitly state what evidence it relied on to determine that Salary was not invoking his right to counsel regarding the current interrogation.

In reviewing this ruling, we consider that in determining whether an invocation of a defendant's right to counsel was clear and unambiguous, a court may consider only statements made by the defendant before the alleged invocation. *Smith v. Illinois*, 469 U.S. 91, 100, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984) ("[A]n accused's post-request responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself."); see also *State v. Cline*, 295 Kan. 104, 114, 283 P.3d 194 (2012) (citing *Smith* and applying the same rule to the right to silence).

26

In *Cline*, officers interrogating the defendant asked about several conflicting stories he had told them about a shooting. When officers asked Cline why he had given them so many different accounts of the events, he went into a rant and concluded by saying he was "'through talking.'" 295 Kan. at 112. Following this statement, officers immediately asked him about another version of the story, and Cline answered, without indicating he no longer wished to talk to the officers.

Before trial, the district court ruled that Cline's statement was admissible in its entirety because the things he had said after invoking his right to silence only reiterated and clarified what he had said before that point in the interrogation. On appeal, we held that the district court "erred by jumping ahead to consider Cline's statements after he stated he was through talking" in determining whether he had invoked his right to remain silent. *Cline*, 295 Kan. at 114. In the instant case, the district court made a similar error by admitting into evidence the portions of Salary's statement made after he invoked his right to have counsel present during the interrogation—a ruling based on Salary's resumed speaking to detectives after invoking his right to counsel.

But, even when we consider only the circumstances preceding Salary's request, we cannot agree that the context in which he asked for a lawyer established he wanted a lawyer to represent him only in subsequent court proceedings. We find persuasive Detective Owens' testimony that Salary interrupted him and said, "I do want a lawyer,"— immediately following Owens' warning from the "advice of rights" that Salary had a right to the assistance of counsel during questioning. We interpret the timing of Salary's request as an unambiguous invocation of his right to have counsel present at that time. And aside, perhaps, from the detective's providing Salary *Miranda* warnings before the pre-interview, the record does not indicate any discussion whatsoever about the appointment of counsel for subsequent court proceedings.

27

We therefore conclude Salary made an unambiguous request to be assisted by counsel during the interrogation. This request means questioning should have stopped as soon as he invoked that right. Accordingly, we hold the district court erred in admitting Salary's recorded confession.

The State argues this error was harmless. Because the error implicates Salary's rights under the Fifth Amendment to the United States Constitution, it is constitutional error. So to conclude it was harmless this court must be persuaded beyond a reasonable doubt that there was no impact on the trial's outcome, *i.e.*, there is no reasonable possibility that the error contributed to the verdict. *State v. Ward*, 292 Kan. 541, Syl. ¶ 6. As the party benefitting from the error, the State bears the burden of proving the error was harmless. 292 Kan. at 560-61.

In support of harmlessness, the State points out Salary asked for a lawyer only after he had already given his unrecorded confession during the pre-interview. And Detective Owens testified at trial that the information Salary gave detectives during his recorded statement was the same as the information he gave them during the pre-interview.

Salary's recorded statement is not in the record on appeal. But Detective Owens' sworn testimony is. And it is sufficient for us to conclude the State has shown beyond a reasonable doubt that there is no reasonable possibility that admitting Salary's recorded statement could have had an impact on the jury's verdict. See *Ward*, 292 Kan. at 565; see also *Cline*, 295 Kan. at 114-15 (harmless constitutional error to admit statements made after invocation of right to silence when subsequent statements merely reiterated Cline's earlier story).

Accordingly, we hold the district court's error in admitting the recorded confession was harmless.

Issue 4: *Salary's hard 50 sentence is unconstitutional under the United States Supreme Court's decision in* Alleyne v. United States.

Salary challenges the constitutionality of the Kansas sentencing scheme used to impose upon him a hard 50 sentence, *i.e.*, a life sentence which requires him to serve 50 years in prison before he is eligible for parole. He claims it denied him the right to have a jury decide beyond a reasonable doubt all of the facts that may increase the penalty for first-degree murder. After the briefs were filed in this case, the United States Supreme Court held that "any fact that increases the mandatory minimum [sentence] is an 'element' that must be submitted to the jury" and proven "beyond a reasonable doubt." *Alleyne v. United States*, 570 U.S. __, 133 S. Ct. 2151, 2155, 186 L. Ed. 2d 314 (2013).

We applied *Alleyne* to Kansas' hard 50 sentencing scheme in *State v. Soto*, 299 Kan. 102, 322 P.3d 334 (2014). There, we held the procedure for imposing a hard 50 sentence set forth in K.S.A. 21-4635 violates the Sixth Amendment to the United States Constitution. Specifically, it permits the district court to find by a preponderance of the evidence the existence of one or more aggravating factors necessary to impose an increased mandatory minimum sentence, instead of requiring a jury to find the existence of one or more of the aggravating factors beyond a reasonable doubt. 299 Kan. at 124.

The district court imposed a hard 50 sentence after finding Salary committed the murder in an especially heinous, atrocious, or cruel manner. See K.S.A. 21-4636(f). It found that this aggravating factor outweighed the mitigating factors presented by Salary at sentencing. Salary challenges the sufficiency of the evidence supporting this aggravator, in addition to challenging the constitutionality of the hard 50 sentencing scheme.

29

Because the constitutional issue has been resolved in Salary's favor, we must vacate his sentence and remand the case for resentencing. See *Soto*, 299 Kan. at 124.

We need not consider Salary's argument that the evidence was insufficient for the district court to conclude he committed the murder in an especially heinous, atrocious, or cruel manner. This issue is moot because we have vacated Salary's sentence on *Alleyne* grounds. See *State v. Roeder*, 300 Kan. 901, 942, 336 P.3d 831 (2014); *State v. Coones*, 301 Kan. 64, 85-86, 339 P.3d 375 (2014).

Salary's convictions are affirmed. His hard 50 sentence is vacated, and the case is remanded to the district court for resentencing.

MICHAEL J. MALONE, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** Senior Judge Malone was appointed to hear case No. 104,181 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court created by the appointment of Justice Nancy Moritz to the United States 10th Circuit Court of Appeals.