NOT DESIGNATED FOR PUBLICATION

No. 113,900

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

SONY UK,
*Appellee*.

MEMORANDUM OPINION

Appeal from Lyon District Court; DOUGLAS P. JONES, judge. Opinion filed February 9, 2018.
Affirmed.

*Darrell Smith*, assistant county attorney, *Amy L. Aranda*, first assistant county attorney, *Marc Goodman*, county attorney, and *Derek Schmidt*, attorney general, for appellant.

*Stephen J. Atherton*, of Atherton & Huth, of Emporia, for appellee.

Before MALONE, P.J., BUSER and BRUNS, JJ.

PER CURIAM: The State appeals the district court's grant of immunity to Sony Uk, and the dismissal of attempted voluntary manslaughter or, alternatively, aggravated battery charges against him. Our court initially reversed the grant of immunity and dismissal of the charges, and remanded for the refiling of the complaint and for further proceedings. *State v. Uk*, No. 113,900, 2016 WL 5867236 (Kan. App. 2016) (unpublished opinion). However, our Supreme Court granted Uk's petition for review, summarily vacated our court's decision, and remanded the case to our court for reconsideration in light of *State v. Hardy*, 305 Kan. 1001, 390 P.3d 30 (2017). Finding that the district

1

court's decision granting immunity to Uk was supported by substantial competent evidence, we now affirm the district court's judgment.

We will begin by setting forth the facts. Uk and his brother, Viseth Ear, lived together in a small residence in Emporia, Kansas. On the morning of April 4, 2015, their mother, Hoeun Kraus, arrived at the residence to visit her sons and to bring them some food. Uk and Ear were in their bedrooms when Kraus arrived at the residence and walked inside. Kraus and her two sons were the only persons present in the residence.

Kraus called for Uk to come to the living room to get the food she had placed on the coffee table. Uk came out of his room, took some food, and went back to his bedroom. Kraus then called for Ear to come out of his room to get some food. Ear came out of his room a short time later. He appeared disoriented and acted like he did not recognize his mother. Kraus became frightened upon seeing Ear in this condition. According to Kraus, Ear approached her and hit her on the right side of the head. Ear hit Kraus in the head a second time which caused her to fall. He then jumped on top of Kraus and held her down on the floor. Ear continued to strike Kraus causing a cut on her face. Kraus tried to leave, but she was unable to break Ear's hold on her.

Uk walked out of his bedroom and saw Ear on top of Kraus, striking her with his hands. Kraus had blood on her face from the cut caused by Ear. Kraus heard Uk say, "What you do to mom? Why you hit mom?" Uk then fired a shot from a .22 caliber firearm in the direction of Ear. Ear stood up and "maybe a second or two" later, Uk fired a second bullet which most likely struck Ear in his arm, although a doctor who later examined Ear was unable to testify exactly where the entrance wound was located. Ear shouted an expletive and began to run away. Uk fired a third shot at Ear as he was trying to run back to his bedroom and the bullet splintered the bedroom door. Ear was later treated in the emergency room where he was combative and appeared to be drunk.

2

On April 7, 2015, the State charged Uk with one count of attempted voluntary manslaughter. The State later amended the complaint and added an alternative charge of aggravated battery. On May 13, 2015, Uk filed a motion to dismiss and a claim of immunity from prosecution. In the motion, Uk argued that he was authorized to use deadly force against Ear to prevent imminent death or great bodily harm to Kraus.

On May 18, 2015, the district court held a preliminary hearing jointly with a hearing on Uk's motion to dismiss. Kraus testified at the hearing along with some law enforcement investigators and medical personnel. Uk did not testify; however, without any objection by the State, he did have the court take judicial notice that Ear had been charged with aggravated battery of Kraus as a result of this incident. Ear invoked his Fifth Amendment right against self-incrimination and did not testify at the hearing.

At the hearing, the prosecutor emphasized that the district court should view the evidence in the light most favorable to the State. The State's theory was that by the time Uk fired the second shot, Ear already had stood up from beating his mother and had "disengaged" from causing any kind of harm to Kraus. The State argued that any potential for claim of immunity "would have eroded" by the second shot. After hearing the evidence, the district court ruled that Uk was immune from prosecution and dismissed the criminal complaint. The magistrate judge ruled:

> "I will find that Mr. Uk should be immune from further prosecution under the statute as
> previously cited that his actions, based upon my review of the evidence today, were
> justified based upon a reasonable belief as the evidence has set forth today. . . . I would
> find the State has failed to meet its burden that force was not justified and so I'm granting
> the motion today."

On appeal, a majority of this court stated that "[v]iewing the evidence in a light most favorable to the State, we are persuaded the prosecution sufficiently proved probable cause to believe that Uk's use of deadly force in defense of his mother was not

3

justified." 2016 WL 5867236, at *10. Accordingly, this court held that the district court "erred in its legal conclusion that the State did not establish probable cause to believe that Uk's use of deadly force was not justified under K.S.A. 2015 Supp. 21-5222(a). As a result, the district court erred in granting Uk immunity from prosecution under K.S.A. 2015 Supp. 21-5231." 2016 WL 5867236, at *11.

We will now reconsider our initial decision in light of our Supreme Court's holding in *Hardy*. We begin by reviewing some of the applicable statutes. In 2010, the Kansas Legislature enacted a series of statutes addressing the use of force, including the use of deadly force, in the defense of a person or property, including a person's dwelling. See K.S.A. 2016 Supp. 21-5220 et seq. The statutes are commonly known as this state's "stand-your-ground law." K.S.A. 2016 Supp. 21-5222 states:

"(a) A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force.

"(b) A person is justified in the use of deadly force under circumstances described in subsection (a) if such person reasonably believes that such use of deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person.

"(c) Nothing in this section shall require a person to retreat if such person is using force to protect such person or a third person."

K.S.A. 2016 Supp. 21-5230 states:

"A person who is not engaged in an unlawful activity and who is attacked in a place where such person has a right to be has no duty to retreat and has the right to stand such person's ground and use any force which such person would be justified in using under article 32 of chapter 21 of the Kansas Statutes Annotated, prior to their repeal, or

4

K.S.A. 2016 Supp. 21-5202 through 21-5208, 21-5210 through 21-5212, and 21-5220 through 21-5231, and amendments thereto."

Finally, K.S.A. 2016 Supp. 21-5231 provides immunity from prosecution for any person who lawfully uses force in defense of a person or property. That statute states:

"(a) A person who uses force which, subject to the provisions of K.S.A. 2016 Supp. 21-5226, and amendments thereto, is justified pursuant to K.S.A. 2016 Supp. 21-5222, 21-5223 or 21-5225, and amendments thereto, is immune from criminal prosecution and civil action for the use of such force, unless the person against whom force was used is a law enforcement officer who was acting in the performance of such officer's official duties and the officer identified the officer's self in accordance with any applicable law or the person using force knew or reasonably should have known that the person was a law enforcement officer. As used in this subsection, 'criminal prosecution' includes arrest, detention in custody and charging or prosecution of the defendant.

"(b) A law enforcement agency may use standard procedures for investigating the use of force as described in subsection (a), but the agency shall not arrest the person for using force unless it determines that there is probable cause for the arrest.

"(c) A prosecutor may commence a criminal prosecution upon a determination of probable cause."

In *State v. Ultreras*, 296 Kan. 828, 845, 295 P.3d 1020 (2013), the Kansas Supreme Court determined that the standard of proof for whether a defendant is entitled to immunity from criminal prosecution is probable cause. Furthermore, the State bears the burden of establishing proof that the force used by the defendant was not justified as part of the probable cause determination under the immunity statute. 296 Kan. at 845. In other words, the State bears the burden of proving a negative, i.e., that the defendant's use of force in self-defense or defense of another person was *not* justified.

In *State v. Hardy*, 51 Kan. App. 2d 296, 304, 347 P.3d 222 (2015), *rev'd* 305 Kan. 1001, 390 P.3d 30 (2017), this court held that in considering a motion for self-defense immunity, a district court must conduct an evidentiary hearing unless the parties stipulate

5

to the factual record. The hearing should be held in conjunction with the preliminary hearing whenever possible. This court further held that consistent with making a probable cause determination at a preliminary hearing, the district court must view the evidence in a light favoring the State, meaning conflicts in the evidence must be resolved to the State's benefit and against a finding of immunity. 51 Kan. App. 2d at 304.

In our initial decision herein, we adopted the analysis in our court's ruling in *Hardy* and considered the evidence against Uk in a light most favorable to the State. See *State v. Uk*, 2016 WL 5867236, at *7. However, our court's ruling in *Hardy* was subsequently reversed by the Kansas Supreme Court, which held:

> "Upon a motion for immunity pursuant to K.S.A. 2016 Supp. 21-5231, the district court must consider the totality of the circumstances, weigh the evidence before it without deference to the State, and determine whether the State has carried its burden to establish probable cause that the defendant's use of force was not statutorily justified." *State v. Hardy*, 305 Kan. 1001, Syl. ¶ 1.

Our Supreme Court has directed that in considering a defendant's motion for immunity, the district court must weigh the evidence without deference to the State, i.e., the district court does not view the evidence in a light favoring the State. Based on the totality of the circumstances, the district court must determine whether the State has carried its burden to establish probable cause that the defendant's use of force was not statutorily justified. 305 Kan. at 1011. On appeal of a district court's decision on a motion for immunity, our Supreme Court has set forth the applicable standard of review:

> "An appellate court will apply a bifurcated standard of review to a district court's determination of probable cause pursuant to K.S.A. 2016 Supp. 21-5231. When a district court's ruling entails factual findings arising out of disputed evidence, a reviewing court will not reweigh the evidence and will review those factual findings for supporting substantial competent evidence only. The ultimate legal conclusion drawn from those facts is reviewed de novo." 305 Kan. 1001, Syl. ¶ 5.

Our Supreme Court recently has upheld the district court's grant of immunity to a defendant using deadly force in self-defense in two separate cases, finding that the district court's decision in each case was supported by substantial competent evidence. In *Hardy*, the defendant, Marlon Hardy, rode as a passenger in his friend's Mustang convertible to pick up two young women at a party. When Hardy and his friend attempted to leave the party with one of the women, a dispute arose with Javier Flores. Flores, along with a group of five to nine partygoers, surrounded the open convertible, preventing it from moving. Flores, who was unarmed, approached the passenger side of the convertible, reached in, and struck Hardy two to three times in the face. Hardy then picked up a gun from the console and shot Flores once.

The State charged Hardy with aggravated battery. At the preliminary hearing, one of the issues was whether Flores had "disengaged" from the fight before Hardy shot him. 305 Kan. at 1002. The female passenger in the convertible testified that Flores had "backed up a little bit," and Hardy fired the shot about a second later. 305 Kan. at 1002. She also testified that when Hardy fired the shot, the convertible's path was clear enough to drive away. Hardy filed a motion for immunity and claimed his use of force was justified to protect himself or another pursuant to K.S.A. 2016 Supp. 21-5222(a). The parties submitted the matter to the court based on the preliminary hearing evidence and other stipulated evidence. Ultimately, the district court weighed the evidence and granted Hardy's motion, finding that the State had failed to carry its burden of probable cause and that Hardy was immune from prosecution pursuant to K.S.A. 2016 Supp. 21-5231. Specifically, the district court found that the fact that Flores struck Hardy in the face two or three times was the type of action by the victim that "'can cause great bodily harm, thus causing the defendant having to prevent imminent great bodily harm.'" 305 Kan. at 1005.

On appeal, our Supreme Court determined that in evaluating a defendant's motion for immunity, the district court is required to weigh the evidence before it without

7

deference to the State. 305 Kan. at 1011. Our Supreme Court went on to hold that the district court's factual findings were supported by substantial competent evidence which in turn supported the district court's ultimate legal conclusion that Hardy was entitled to statutory immunity from prosecution. 305 Kan. at 1013-14.

In *State v. Evans*, 305 Kan. 1072, 389 P.3d 1278 (2017), the defendant, Dustin Alex Evans, and his neighbor, Jose Luis Pena, Jr., were conversing alone in Evans' garage when they agreed to compete in a wrestling match. Evans pulled a wrestling mat out onto his driveway, and the two men began wrestling. The match eventually soured when Evans claimed that Pena put his hand over Evans' mouth and tried to suffocate him. After Evans broke free from Pena's grasp, he went back into his garage, claiming that Pena tried to kill him. Once inside his garage, Evans grabbed a katana-style sword and stabbed Pena, who was unarmed, in the abdomen. Evans called 911 to report the stabbing. When law enforcement arrived at the scene, Evans told them that he had stabbed Pena in self-defense.

The State charged Evans with aggravated battery and he moved for a grant of immunity pursuant to K.S.A. 2016 Supp. 21-5231. The district court held an evidentiary hearing. After weighing the evidence, the district court granted Evans immunity and dismissed the charges, finding that the State had failed to demonstrate probable cause that Evans' use of force was not statutorily justified. On appeal, our Supreme Court held there was substantial competent evidence to support the district court's factual findings, and the district court correctly granted Evans statutory immunity pursuant to K.S.A. 2016 Supp. 21-5231. 305 Kan. at 1075.

We note that *Hardy* is distinguishable from Uk's case because in *Hardy* both the district court and our Supreme Court relied, in part, on a statutory presumption of the defendant's reasonable belief that deadly force was necessary, found at K.S.A. 2016

8

Supp. 21-5224. See *Hardy*, 305 Kan. at 1013. However, no such statutory presumption was asserted by the defendant or relied upon by the court in *Evans*.

It is significant to note that K.S.A. 2016 Supp. 21-5222(b) provides that a person is justified in the use of *deadly force* if such person reasonably believes that such use of force is necessary to prevent imminent death *or great bodily harm* to such person or a third person. In other words, non-deadly force can be met with deadly force under the express language of the statute. As a result, in *Hardy*, the district court granted immunity to the defendant after he shot an unarmed attacker who had struck the defendant two or three times in the face. 305 Kan. at 1002, 1005. In *Evans*, the district court granted immunity to the defendant after he stabbed an unarmed attacker in the abdomen with a katana-style sword. 305 Kan. at 1072-73. In both cases, our Supreme Court went on to hold that the district court's factual findings were supported by substantial competent evidence which in turn supported the district court's ultimate legal conclusion that the defendant was entitled to immunity. *Hardy*, 305 Kan. at 1013; *Evans*, 305 Kan. at 1075.

Returning to our facts, the district court found that Uk should be immune from further prosecution "based upon my review of the evidence today." In making this determination, the district court was required to weigh the evidence before it without deference to the State. Our task on review is to determine whether there was substantial competent evidence supporting the district court's factual findings and whether those findings support the district court's legal conclusion that Uk is entitled to immunity, bearing in mind that the burden was on *the State* to establish that Uk's use of force was not legally justified under the circumstances of this case. See *Ultreras*, 296 Kan. at 845 (State bears the burden of establishing proof that force used by the defendant was not justified as part of the probable cause determination under the immunity statute).

Kraus testified that Ear struck her in the head which caused her to fall. Ear then jumped on top of Kraus and held her to the floor. He continued to strike Kraus causing a

9

cut on her face. Uk walked out of his bedroom and saw Ear on top of Kraus, striking her with his hands. Kraus testified that she had "blood all over [her] face." Uk asked Ear why he was hitting their mother. He then fired a shot from a .22 caliber firearm in the direction of Ear. Ear stood up and "maybe a second or two" later, Uk fired a second bullet which most likely struck Ear in his arm. Ear was treated in the emergency room where he was combative and appeared to be drunk. Emporia Police Investigator Todd Ayer later interviewed Kraus about the incident. Kraus told Ayer that she thought Uk was trying to protect her and if he had not fired the shots, Ear could have killed her.

K.S.A. 2016 Supp. 21-5222(b) authorized Uk to use *deadly force* under these circumstances if Uk reasonably believed that such use of force was necessary to prevent imminent death *or great bodily harm* to his mother. Uk was inside his residence when the incident took place. Ear was sitting on top of Kraus, holding her down and striking her with his hands. Kraus had blood all over her face. She testified that Ear hit her so hard that she almost blacked out and her face swelled up and turned black. The State later charged Ear with aggravated battery under the theory that he struck Kraus "in a manner whereby great bodily harm, disfigurement, or death can be inflicted."

The burden was on the State to establish probable cause that Uk's use of force was *not* legally justified under the circumstances of this case. The evidence established that the shooting happened very fast and that "maybe a second or two" elapsed between the first two shots. After weighing the evidence, the district court found that "the State has failed to meet its burden" of proving that Uk's use of force in defense of his mother was not legally justified under the circumstances of this case. Based on the record, we find the district court's decision was supported by substantial competent evidence. Given our standard of review, we conclude the district court did not err in granting Uk's motion to dismiss based on his claim of immunity.

Affirmed.

10

* * *

BUSER, J., dissenting: I dissent from my colleagues' affirmance of the district court's grant of immunity in this case. Applying the law from *State v. Hardy*, 305 Kan. 1001, 390 P.3d 30 (2017), I would find the district court erred in its legal conclusion that the State did not establish probable cause to believe that Uk's use of deadly force was not justified under K.S.A. 2016 Supp. 21-5222(b).

FACTUAL BACKGROUND

A careful and detailed analysis of the facts presented to the district court is necessary to an understanding of the erroneous legal conclusion made by the district court and affirmed by my colleagues. The following excerpt from our panel's majority opinion in *State v. Uk*, No. 113,900, 2016 WL 5867236 (Kan. App. 2016) (unpublished opinion), sets forth the factual background relating to Uk's use of deadly force:

> "According to Kraus, Ear approached her and hit her on the right side of the head. Ear then hit his mother in the head a second time which, she testified, caused her to 'fall and knock my head on the back then he straddle on top of me . . . He stay on top of me.' Kraus and Ear are about the same size, but Ear is stronger than his mother and, as a result, he was able to hold her down. According to Kraus, while Ear was on top of her 'he hit me one time then on the front, that's why I got cut.' As a result, she had blood on her face. The cut also caused 'a little bit' of a scar. Kraus reported that her face was swollen. According to Kraus, Ear struck her with his hand three times during the entire incident. She never testified that Ear struck her with his fist. Kraus tried, without success, to leave out the front door.
>
> "After Kraus fell to the floor, her face went numb, and her vision was blurred. Kraus heard Uk come from his bedroom and say, 'What you do to mom? Why you hit mom?' Kraus then heard a noise she described as a 'pop.' According to Kraus, upon hearing the pop, Ear stopped hitting her, pushed her away, and then tried to get up from the floor. Kraus testified that she thought Ear stood up and faced Uk: 'Then he just turn

11

around, turn the face to the pop what, the way, just stop and [Ear] turn around like that. He try to go to beat [Uk], whatever. I don't know.' According to Kraus, she then 'heard a second pop, that's why [Ear said], "Oh shit. Shit."' Kraus testified that after the second pop Ear went to his bedroom and closed the door, whereupon Kraus heard a window break in Ear's bedroom.

. . . .

"As part of his duties, Investigator Todd Ayer interviewed Kraus regarding the incident. According to the investigator, Kraus advised:

. . . .

"'She said Viseth came out of—out of his bedroom and said that he'd been waiting to see her and then began hitting her.

. . . .

"'She said she hit the ground or she fell to the ground and hit the back of her head as she did. She said—she said that Mr. Ear continued his attack at which point she heard Sony come out asking why he was hitting his mom, why—what, you know, what he was doing. *She stated that she heard a pop, um, she said Viseth stopped hitting her and kind of turned around to see what it was. She said she heard another pop* at which time she said Viseth jumped up and ran into his bedroom and then she heard the window break as she was opening the front door to leave.'"

"Investigator Ayer testified that the way Kraus described the shooting, he understood that 'maybe a second or two' elapsed between the two shots or at least enough time 'for [Ear] to turn before [Kraus] heard the second pop.' Additionally, Kraus told the investigator that a few months prior to the incident, Uk showed her a long gun he had in his possession. Investigator Ayer noted that Kraus had sustained the following injuries: 'She had a—it was a bruise up on her forehead. There was a cut right in the middle of her forehead. There was a lump on the back of her head.'"

"Dr. Peter James Seberger treated Ear in the emergency room of Newman Regional Hospital. . . .

"Upon examining Ear, Dr. Seberger observed that 'it looked like some kind of entrance wound by something in the left elbow and he had a small laceration of his penis.' The doctor opined that the entrance wound was consistent with having been made by a gunshot. An x-ray of the wound revealed: 'a foreign object, very dark or radio opaque, consistent with a small caliber bullet. . . . Then, there was a fracture involving the—we call it the proximal portion of the ulna or the portion of the ulna closest to the body was

fractured and was going to need further treatment.' With regard to the location of the entrance wound as demonstrated by Dr. Seberger in court, the magistrate judge summarized his understanding that 'I think the doctor was pointing to what I would call *the outside of the arm or the part of the arm that would be facing away from the body*.' The doctor indicated he was unable to testify exactly as to the location of the entrance wound." (Emphases added.) 2016 WL 5867236, at *1-3.

At the conclusion of the evidence, the district judge made the following findings of fact and conclusions of law:

"So I'll make some findings of fact. The alleged date of the offense and claim of immunity occurred on April the 4th of 2015, in Lyon County, Kansas. Mrs. Kraus went to the residence at 522 West Street, Emporia, Lyon County, Kansas, where both Sony Uk and Viseth Ear resided. She brought food to her sons, Mr. Uk and Mr. Ear. She gave food to Mr. Uk and he went back into his room or she gave it to him in his room. Then Mr. Ear appeared and appeared to be upset. Ms. Kraus testified that she did not believe that Mr. Ear knew who she was. He then struck her twice. After he struck Ms. Kraus twice and Mr.—this is Mr. Ear who struck Ms. Kraus twice, she then fell. I believe hit her head on a table. He then struck her a third time. It was then Mr. Uk appeared and directed comments toward Mr. Ear as to, 'Why are you doing this to mom?' or 'Why are you doing this?' and then Mr. Ear seemed to—made a motion backing away from Ms. Kraus. After the second strike, he then was on top of Ms. Kraus. Before the third strike, he made a motion back to either stand up or to look away toward Mr. Uk. It's in this period of time where, before he stood up or removed himself from Ms. Kraus, there was an initial pop or gunshot and then a second gunshot after he removed himself. I believe that the—it's my opinion that the evidence was that this took place in no more than a second or a few seconds, so I classify that as the break in the period of time in which the period of the first shot to the sound shot. So that is really the evidence.

"So, the claim of immunity is that Mr. Uk, in firing a weapon that struck Mr. Ear, should be immune from prosecution to protect Ms. Kraus from potentially great bodily harm. And, again, the Court has taken judicial notice of Case 15-CR-152 where the State has alleged that Mr. Ear did comment an aggravated battery on Ms. Kraus whereby great bodily harm or death can be inflicted.

13

"So, based on the evidence I have heard today, I will find that Mr. Uk should be immune from further prosecution under the statute as previously cited that his actions, based upon my review of the evidence today, were justified based upon a reasonable belief as the evidence has set forth today. So, the motion for a claim of immunity from prosecution is going to be granted. I would find the State has failed to meet its burden that force was not justified and so I'm granting the motion today. So, I believe based upon that finding, then the amended complaint/information should be dismissed."

INTRODUCTION

At the outset, I agree with my colleagues that our Supreme Court's opinion in *Hardy* establishes the appropriate standard of review in immunity cases such as this one:

"An appellate court will apply a bifurcated standard of review to a district court's determination of probable cause pursuant to K.S.A. 2016 Supp. 21-5231. When a district court's ruling entails factual findings arising out of disputed evidence, a reviewing court will not reweigh the evidence and will review those factual findings for supporting substantial competent evidence only. The ultimate legal conclusion drawn from those facts is reviewed de novo. 305 Kan. 1001, Syl. ¶ 5."

In the present case, the material evidence was undisputed that Uk shot and wounded Ear with a deadly weapon. The critical question is whether the district court's conclusion of law that the State had not shown probable cause that deadly force was not justified under these factual circumstances was proper, and whether that legal conclusion was supported by substantial competent evidence.

USE OF EXCESSIVE FORCE AFTER EAR HAD DISENGAGED FROM HITTING KRAUS

Although the district court did not make a specific finding regarding which of the three shots fired by Uk struck Ear, as detailed earlier, there was substantial competent evidence to support the State's theory that the second shot was the only one to strike Ear

14

and this shot was only fired *after* Ear had disengaged and had stopped hitting his mother. As the district court found, "there was an initial pop or a gunshot and then a second gunshot *after* [*Ear*] *removed himself*" from Kraus. The district judge added "the evidence was that this took place in no more than a second or a few seconds, so I classify that as *the break in the period of time* in which the period of the first shot to the second shot."

The evidence supports the district court's undisputed findings. Kraus testified that after she was struck and fell to the floor, Ear was on top of her when Uk fired the first shot. After the first shot, however, Kraus testified that Ear discontinued his assault. In her own words, "He stop on the first pop." Then, according to Kraus, she believed that Ear stood up, turned around and faced Uk: "Then he just turn around, turn the face to the pop what, the way, just stop and [Ear] turn around like that. He try to go to beat [Uk], whatever. I don't know."

There was considerable testimony by Kraus detailing what occurred between the first shot and the second shot:

> "Q.   And did you see what [Ear] did after you heard that first pop, he got up?
> "A.   He just push me down, push me push, then push me away from him.
> "Q.   Okay.
> "A.   Yeah, then he tried to get up.
> "Q.   And he got—did he stand up?
> "A.   Yeah.
> "Q.   Did he turn around or . . .
> "A.   Yeah, turn around, turn around, look face to the door. He heard the pop,
>        whatever, I don't know.
> "Q.   Okay.
> "A.   I don't know the way he turn around. He just push me down already.
>        . . . .
> "Q.   Okay. So, he—does he—he got up though?
> "A.   Yes.

15

"Q.    Stood up and turned around?

"A    Turned around.

. . . .

"Q.    Is he standing up on his feet when he turns around and you hear the second pop or is he down—crouched down on the floor when you hear him or he turns around and you [hear] the second pop?

"A.    He—I think he stand, then I—him and me not touch each other already. I think he stand or whatever, I don't know."

According to Kraus, she then "heard second pop, that's why [Ear said], 'Oh shit. Shit.'" Additionally, the district court understood the medical testimony as establishing that the entry point of the bullet was on the "outside of the arm or the part of the arm that would be facing away from the body." This expert medical testimony corroborated Kraus' eyewitness account that Ear had turned and faced the armed Uk at the time the second shot was fired.

In summary, a fair reading of Kraus' eyewitness testimony and Dr. Seberger's corroborating expert testimony shows that at the time the second shot was fired, Ear had stopped hitting his mother, stood up, turned around, and faced Uk, whereupon he was struck by the second shot which caused the bullet to enter the anterior part of Ear's arm, and resulted in Uk twice uttering an expletive.

Given this undisputed evidence, three inferences are readily apparent. First, as the district court found, there was a "break in the period of time" between the first and second shots. Second, during that break, which the district court found lasted "no more than a second or a few seconds," Ear had disengaged when he stopped hitting his mother, pushed her away as he stood up, and turned towards Uk and faced him, whereupon the second shot was fired. Third, given that the front of Ear's body was positioned away from Uk at the time of the first shot (when Ear was on the floor and facing away from Uk), and the third shot (as Ear had escaped from Uk by running into his bedroom and jumping out

16

the window), and the direct and circumstantial evidence that Ear was facing Uk when Uk fired the second shot, it is apparent that Ear was struck by the second shot which Uk fired only after Ear had disengaged and stopped hitting his mother.

Based on these facts, the district court and my colleagues have made an error of law in concluding that the State did not show probable cause that Uk was not engaged in the defense of Kraus at the time he shot Ear.

The use of excessive force is never justified as self-defense or defense of another. "[I]t is well settled that a person cannot use greater force than is reasonably necessary to resist the attack." *State v. Marks*, 226 Kan. 704, 712, 602 P.2d 1344 (1979); see *State v. Deal*, 293 Kan. 872, 889-90, 269 P.3d 1282 (2012) (Supreme Court held any confusion regarding Deal's right to fight back in self-defense was harmless because Deal's beating of victim with a tire iron exceeded the force necessary to wrestle the tire iron from the victim.). Here, undoubtedly because Ear heard the first shot and realized that Uk was armed with a deadly weapon, Ear stopped hitting his mother and disengaged from the assault. As a result, Uk's use of deadly force was not necessary to resist Ear's attack which was already over when deadly force was used.

The concept of disengagement and excessive use of force has been frequently addressed by Kansas appellate courts, typically in the context of claimed jury instructional error. "Normally, whether the force is excessive is a question for the jury." *State v. Holley*, No. 92,861, 2006 WL 851236, at *4 (Kan. App. 2006) (unpublished opinion). However, a self-defense instruction is "not required if the force used by defendant in the claimed self-defense is excessive as a matter of law." PIK Crim. 4th 52.200 (2016 Supp.), Notes on Use. Of particular importance given the fact pattern of the Uk case, when a defendant continues to use physical force after any threat to the defendant is eliminated, the defendant's use of force is excessive as a matter of law. See *State v. Davis*, No. 92,443, 2006 WL 1379577, at *3 (Kan. App. 2006) (unpublished

17

opinion) (holding a self-defense instruction is not warranted when the defendant uses force that is excessive and continued after the initial aggressor ceased to be a threat to her).

The issue of disengagement arose recently in *Hardy*. As our Supreme Court surveyed the critical legal question and factual evidence in that self-defense immunity case:

> "Hardy eventually claimed self-defense, and the case turned on the factual intricacies of that defense—principally, was the shooting contemporaneous with the violence initiated by Flores or had Flores disengaged before being shot? Indeed, preliminary hearing testimony supported both possibilities. Y.M. testified she was in the convertible and saw Hardy fire the shot after Flores had 'backed up a little bit.' She explained someone was pulling Flores away from the car but Flores was still 'trying to get' Hardy. About a second later, Hardy shot Flores. Y.M. also recalled that when Hardy fired the shot, the convertible's path was clear enough to drive away. Flores' story flip-flopped throughout his testimony. Multiple times Flores testified he heard the shots right *before* he stopped punching. Yet, he also testified he heard the gunshot *after* he stopped punching or walked away." *Hardy*, 305 Kan. at 1002-03.

Acknowledging the highly controverted evidence of whether disengagement had occurred in *Hardy*, our Supreme Court concluded that the district court's factual findings were supported by substantial competent evidence. In particular, our Supreme Court emphasized:

> "Though there is *conflicting testimony* concerning exactly what Flores was doing when Hardy fired the shot—whether he was backing up a little or still punching Hardy—the evidence is sufficient to support a reasonable factfinder's conclusion that *the violence was contemporaneous* and the risk of great bodily harm to Hardy was imminent." (Emphasis added.) *Hardy*, 305 Kan. 1012-13.

18

*Hardy* is instructive. Although there was evidence supporting disengagement, there was also evidence supporting that Flores was actively attacking Hardy at the time the offending shots were fired. As our Supreme Court concluded: "Since Flores himself testified multiple times that Hardy shot him *during* the attack, the district court could reasonably conclude that Hardy fired the shot *while* Flores' arm was still present—and Hardy was still under attack—in the vehicle." 305 Kan. 1013. Thus, it was appropriate for the district court to resolve the issue in favor of self-defense given the evidence of engagement and the statutory presumption of reasonableness set forth in K.S.A. 2016 Supp. 21-5224(a)(1)(A) which applied because Flores entered an occupied vehicle to strike Hardy.

But that is not our case. Here, there was no statutory presumption of reasonableness and no disputed evidence found by the district court. The only substantial competent evidence showed that Ear was shot after he had disengaged from hitting his mother. This disengagement involved Ear pushing his mother away, getting up from the floor, and standing up and turning to face Uk, whereupon he was shot in the anterior portion of his arm. Given these factual findings, the district court erred as a matter of law in granting Uk immunity when it is clear that these facts showed probable cause that Uk used excessive force by shooting Ear after the conclusion of the assault when no attack was imminent.

NO SHOWING OF A REASONABLE BELIEF IN THE NECESSITY OF USING DEADLY FORCE

There is a second basis upon which I believe the district court and the majority erred in arriving at their legal conclusion. K.S.A. 2016 Supp. 21-5222(b) permits the use of deadly force in those circumstances wherein an individual reasonably believes the use of deadly force is necessary to prevent imminent death or great bodily harm to that person or another. In the present case, however, there was *no evidence* presented that Uk subjectively believed that deadly force was necessary to prevent imminent death or great

19

bodily harm to his mother. Secondly, assuming Uk had a subjective belief, that belief was not objectively reasonable because a reasonable person in Uk's circumstances would believe that Kraus was not in imminent risk of death or great bodily harm and, as a result, would not have used deadly force.

Kansas law, as set forth in K.S.A. 2016 Supp. 21-5222, sets forth a two-pronged test to determine whether the use of force was legally justified. The first prong is a *subjective* test which requires a showing that the defendant "sincerely and honestly believed" the use of force was necessary to defend himself against imminent use of unlawful force. *State v. Salary*, 301 Kan. 586, 593-94, 343 P.3d 1165 (2015). The second prong is an *objective* test which requires a showing that "a reasonable person in the defendant's circumstances would have perceived" that the use of force was necessary to defend himself against imminent use of unlawful force. 301 Kan. at 594.

These two prongs also have been codified as part of the "use of force in defense of a person" jury instruction found in PIK Crim. 4th 52.200: "Reasonable belief requires both a belief by defendant and the existence of facts that would persuade a reasonable person to that belief." As our Supreme Court recently explained:

> "A legally sufficient claim of self-defense requires evidence supporting both (1) a subjective belief on the part of the defendant that (a) the use of unlawful force is imminent and (b) the use of force is necessary and (2) an objective determination that a reasonable person would have come to the same conclusions. [Citations omitted.]" *State v. Andrew*, 301 Kan. 36, 45, 340 P.3d 476 (2014).

I will address the subjective and objective prongs separately.

*Subjective Prong*

Did Uk sincerely and honestly believe it was necessary to shoot Ear with a firearm in order to defend his mother from being hit by Ear? The district court did not make any finding that Uk had this requisite subjective belief. In fact, this subjective prong was not addressed by the district court or my colleagues. Yet, it is a critical component to any self-defense analysis. See *State v. Evans*, 305 Kan. 1072, 1073, 1075, 389 P.3d 1278 (2017) (self-defense found where defendant asserted that victim advanced on him threatening to kill him and defendant also told arriving law enforcement officers that he had stabbed victim in self-defense); *State v. Barnes*, 263 Kan. 249, 265-66, 948 P.2d 627 (1997) (subjective prong of self-defense test not met where evidence indicated defendant either initiated or willingly participated in mutual combat); *State v. Sims*, 262 Kan. 165, 172-73, 936 P.2d 779 (1997) (subjective prong of self-defense test not met where defendant claimed at trial no involvement in shooting); *State v. Taylor*, No. 101,224, 2011 WL 2191683, at *5 (Kan. App. 2011) (unpublished opinion) (Sufficient evidence of defendant's subjective belief found where defendant testified he believed that victim posed a threat of imminent great bodily harm to him.).

Although "[a] defendant's own assertions may be sufficient to establish this [subjective] factor," *State v. Walters*, 284 Kan. 1, 9, 159 P.3d 174 (2007), Uk did not testify at the evidentiary hearing, and no statements or interviews of Uk were admitted in evidence. As a consequence, there was no direct evidence of what, if anything, Uk was thinking when he fired his deadly weapon three times at his brother. Additionally, there was no direct evidence that Uk sincerely or honestly believed that discharging a firearm at Ear—rather than the use of some other less deadly force—was necessary to prevent Ear from hitting their mother.

My review of the record testimony also convinces me there was no circumstantial evidence that Uk maintained the required subjective belief to warrant the use of a deadly

21

weapon under these circumstances. On the contrary, Ear was unarmed. And given that Uk fired a third shot at Ear moments after Ear had stopped the attack, ran from the living room, and attempted to escape out his bedroom window, this additional use of deadly force conveys that Uk's intent in discharging his firearm at Ear was something other than self-defense. A reasonable inference from these circumstances is that Uk's intent was to injure his brother as punishment for his dreadful misdeed, was angry, or that he sought to prevent Ear's escape—not that Uk sincerely and honestly believed that shooting Ear was necessary to prevent his mother's imminent death or great bodily harm.

The total lack of evidence presented at the hearing regarding Uk's subjective beliefs on the self-defense issue is important. As our Supreme Court stated in *Hardy*, 305 Kan. 1001, Syl. ¶ 2, and repeated in *Evans*, 305 Kan. at 1074: "The court's determination of probable cause must be premised on stipulated facts or evidence, on evidence received at a hearing pursuant to the rules of evidence, or both." Without any evidence of Uk's sincere and honest belief that Ear's use of unlawful deadly force was imminent and that Uk's use of deadly force was necessary, the district court's legal conclusion granting immunity based on defense of another was an error of law.

*Objective Prong*

In order to meet the second or objective prong of the statutory self-defense test, it must be shown that a reasonable person in Uk's circumstances would have perceived that the use of deadly force in defense of others was necessary. *Salary*, 301 Kan. at 594; see *Tyler v. Nelson*, 163 F.3d 1222, 1227 (10th Cir. 1999) (fulfilling the second prong requires something more than a defendant's stated belief); *Taylor*, 2011 WL 2191683, at *5 (Although subjective prong was complied with, no evidence existed that defendant's stabbing of victim was objectively justified.).

22

In the present case, the evidence showed that Ear was unarmed at all times. Ear hit his mother twice with his hand which caused her to fall to the floor and cut her head. Ear also hit his mother once when she was down on the floor and he was crouched over her. The State argues that because Ear struck his mother with his hand, not a weapon, and she never lost consciousness but only sustained a cut that did not require medical treatment, that she was never in imminent risk of death or great bodily harm.

Uk responds that there was sufficient evidence to prove that Kraus risked suffering great bodily harm or death because Ear was charged in a separate but related criminal case with the aggravated battery of Kraus. It is noteworthy that in the district court's findings at the conclusion of the hearing it specifically stated that it had taken judicial notice of Ear's separate criminal case "where the State has alleged that Mr. Ear did commit an aggravated battery on Ms. Kraus whereby great bodily harm or death can be inflicted."

The charging document which the district court considered as evidence in the immunity hearing alleged that Ear had committed aggravated battery on Kraus and, in the alternative, domestic battery. Before ruling on the complaint's admissibility, the district judge asked if that charge "'in any way supports the defendant's claim for immunity under [K.S.A. 2015 Supp.] 21-5222?'" *Uk*, 2016 WL 5867236, at *4. Uk's counsel replied that it did prove that Uk had justification for believing his mother had sustained aggravated battery. The State disagreed, countering that the complaint alternatively alleged domestic battery which has no element of proof requiring great bodily harm.

I believe the district judge's consideration of the complaint filed against Ear as evidence in Uk's immunity hearing to prove the nature of the injuries to Kraus was error.

> "Kansas charging documents need only show that a case has been filed in the
> correct court, e.g., the district court rather than municipal court; show that the court has

23

territorial jurisdiction over the crime alleged; and allege facts that, *if proved beyond a reasonable doubt*, would constitute a Kansas crime committed by the defendant." (Emphasis added.) *State v. Dunn*, 304 Kan. 773, Syl. ¶ 2, 375 P.3d 332 (2016).

The complaint was improperly considered as evidence or proof that Ear, in fact, had committed an aggravated battery on Kraus. It was not proof of the crime alleged, it was only the formal charge which the State was required to prove beyond a reasonable doubt at Ear's separate trial. The district court's consideration of the complaint against Ear as evidence in the immunity hearing was error. The complaint had no probative value and should not have been considered as evidence supporting the district court's conclusion of law regarding immunity.

Apart from the lack of substantial competent evidence to show that a reasonable person would have believed that the use of deadly force against Kraus was imminent, there also was no showing that a reasonable person would have believed that the use of deadly force was necessary to defend Kraus. In this regard, it is apparent that at the time of the assault, with Uk standing nearby, a wide range of less-than-deadly force was available to him to stop the assault. Yet, Uk did not attempt to pull Ear off his mother, strike him with his hands or feet, or hold him down on the floor.

Another use of less-than-deadly force was available to Uk—he could have threatened Ear with the firearm without discharging it. Our court has found "the self-defense statutes permit a person to defend himself or herself by drawing a handgun and pointing it in a threatening manner even to resist nonlethal force." *State v. Sanders*, No. 103,171, 2011 WL 3276191, at *5 (Kan. App. 2011) (unpublished opinion). See 2 LaFave, Substantive Criminal Law § 10.4(a) (3d ed. 2017) ("But merely to threaten death or serious bodily harm, without any intention to carry out the threat, is not to use deadly force, so that one  may be justified in pointing a gun at his attacker when he would not be justified in pulling the trigger.").

24

Given the wide range of less-than-deadly force that was available to Uk to interrupt or stop Ear's assault, I would find, as a matter of law, that the objective prong of the self-defense test was not met on this evidentiary record. There was simply no showing that a reasonable person in Uk's circumstances would have perceived that the defense of Kraus justified the immediate and repeated firing of a deadly weapon at Ear. Under both the subjective and objective prongs of the statutory self-defense test, I believe the district court made an error of law in finding that the State did not meet its burden to establish probable cause that the defendant's use of deadly force was not statutorily justified.

For all of the reasons discussed, I would hold the district court erred in its legal conclusion that the State did not establish probable cause to believe that Uk's use of deadly force was not justified under K.S.A. 2016 Supp. 21-5222(b). As a result, the district court erred in granting Uk immunity from prosecution under K.S.A. 2016 Supp. 21-5231.